In the Matter of George E. (Buzz) **WESTFALL**, Respondent.

No. 72022.

Supreme Court of Missouri, En Banc.

May 3, 1991.

Rehearing Denied June 11, 1991.

John L. Oliver, Jr., Cape Girardeau, for informant.

George E. Schaaf and Gerald P. Greiman, Clayton, for respondent.

COVINGTON, Judge.

This is an original disciplinary proceeding instituted by the Advisory Committee of the Missouri Bar pursuant to *Rule 5* against respondent, George R. (Buzz) Westfall. The information charged respondent with violation of *Rules 8.2(a)* and *8.4(a)* and *(d)* of *Rule 4*, Rules of Professional Conduct, and requested that respondent be disbarred from the practice of law. The Court appointed as Master to hear the proceedings the Honorable Bruce Normile, Judge of the 2nd Judicial Circuit. Judge Normile made findings and recommended that respondent be suspended from the practice of law for one year and that the order of suspension be stayed subject to certain conditions. In a disciplinary proceeding the Master's findings, conclusions and recommendations are advisory in nature. This Court reviews the evidence *de novo*, determines independently the credibility, weight and value of the testimony of the witnesses, and draws its own conclusions of law. *In re Waldron*, 790 S.W.2d 456, 457 (Mo. banc 1990).

At all times relevant respondent served as prosecuting attorney of St. Louis County and as such was involved in a series of prosecutions of Dennis Bulloch for crimes committed in connection with the death of Bulloch's wife, Julia. Respondent first led the prosecution of Bulloch for murder in the first degree. Bulloch was acquitted of that charge and found guilty of involuntary manslaughter. He was subsequently indicted on charges of armed criminal action and destroying physical evidence. The trial court denied Bulloch's motion to dismiss the indictment on grounds of prosecutorial vindictiveness and double jeopardy. Bulloch then filed petition for a writ of prohibition in the Missouri Court of Appeals, Eastern District, seeking to bar further prosecution of these charges. The court of appeals issued a preliminary rule in prohibition and subsequently made the writ absolute.

The court of appeals' opinion in the matter, the unanimous opinion of a three-judge panel of the court, was authored by the Honorable Kent E. Karohl. The court held first that the question of prosecutorial vindictiveness involved disputed facts, a matter to be considered on direct appeal if required. Relying on *Missouri v. Hunter*, 459 U.S. 359, 103 S.Ct. 673, 74 L.Ed.2d 535 (1983), the court also held that a subsequent trial of Bulloch for armed criminal action would constitute a violation of Bulloch's protection under the Double Jeopardy Clause of the Fifth Amendment of the Constitution of the United States.[1] *Missouri v. Hunter* held that where the legislature specifically authorizes cumulative punishment under two statutes, regardless of whether these two statutes proscribe the "same" conduct, it does not violate double jeopardy to impose cumulative punishment under such statutes in a single trial. *Id.*, 103 S.Ct. at 679.

On the day the opinion was issued, respondent made remarks that constitute the basis of the information filed in this case. KSDK–TV, Channel 5, an NBC affiliate in St. Louis, broadcast videotaped portions of an interview with respondent on the 6:00 p.m. and 10:00 p.m. news programs. Respondent's statement was broadcast as follows:

> ... The Supreme Court of the land has said twice that our armed criminal statute is constitutional and that it does not constitute Double Jeopardy.
>
> . . . .
>
> ... but for reasons that I find somewhat illogical, and I think even a little bit less than honest, Judge Karohl has said today that we cannot pursue armed criminal action. He has really distorted the statute and I think convoluted logic to arrive at a decision that he personally likes.
>
> . . . .
>
> The decision today will have a negative impact on all murder one cases pending

1. This Court granted transfer and made the preliminary rule absolute. *State ex rel. Bulloch v. Seier*, 771 S.W.2d 71 (Mo. banc 1989). The United States Supreme Court denied certiorari. *Missouri v. Bulloch*, 493 U.S. ——, 110 S.Ct. 718, 107 L.Ed.2d 738 (1990).

in Missouri, in the future in Missouri, and some that are already on appeal with inmates in prison. So it's a real distressing opinion from that point of view.

. . . .

But if it's murder first degree and we're asking for death, which, of course, is the most serious of all crimes, Judge Karohl's decision today says we cannot pursue both. And that, to me, really means that he made up his mind before he wrote the decision, and just reached the conclusion that he wanted to reach.

The information filed by the Advisory Committee charges respondent with violating *Rules 8.2(a)* and *8.4(a)* and *(d)*, of Supreme Court *Rule 4*, Rules of Professional Conduct. *Rule 8.2(a)* provides:

> A lawyer shall not make a statement that the lawyer knows to be false or with reckless disregard as to its truth or falsity concerning the qualifications or integrity of a judge, adjudicatory officer or public legal officer, or of a candidate for election or appointment to judicial or legal office.

*Rule 8.4* provides in pertinent part:

> It is professional misconduct for a lawyer to:
>
> (a) violate or attempt to violate the rules of Professional Conduct....
>
> (d) engage in conduct that is prejudicial to the administration of justice....

The Advisory Committee submits that respondent reacted to Judge Karohl's opinion in utter disregard of the truth, of the integrity of the judicial process, and of respondent's obligations with respect thereto. The Committee further submits that respondent engaged in this conduct without investigation of the facts and without factual basis for his statements. The Committee briefed and argued additional violations not contained in the information. This Court will consider only those charges contained in the original information. *See Matter of Smith*, 749 S.W.2d 408, 414 (Mo. banc 1988).

I.

In defense respondent contends that his statements were directed to the court of appeals' opinion and not to the qualifications or integrity of Judge Karohl and thus did not concern the qualifications or integrity of a judge. Respondent also asserts that the statements in question were merely the expression of opinion and, because opinion cannot be false, the statements are not proscribed by *Rule 8.2(a)*.

■ This Court first addresses respondent's protestations that his statements were merely expressions concerning the soundness of the court of appeals' decision, not statements of actual and provable facts about the judge's integrity. His contentions are not well taken. First, respondent stated that "the Supreme Court of the Land has twice said our armed criminal action statute is constitutional and that it does not constitute Double Jeopardy." Immediately following, respondent stated:

> ... but for reasons that I find somewhat illogical, and I think even a little bit less than honest, *Judge Karohl* has said today that we cannot pursue armed criminal action. *He* has really distorted the statute and I think convoluted logic to arrive at a decision that *he personally* likes.

(Emphasis added). Later followed this personalized language:

> But if it's murder in the first degree and we're asking for death which, of course, is the most serious of all crimes, *Judge Karohl's* decision today says we cannot pursue both. And that, to me, really means that *he* made up *his* mind before *he* wrote the decision, and just reached the conclusion that *he* wanted to reach."

(Emphasis added.) The statements personalize the judge's conduct and specifically refer to him, his motivation, and his integrity as it relates to his participation in the appellate judicial process.

■ Respondent contends that his statements plainly reflect subjective opinion and not verifiable factual assertions. Because opinion cannot be "false," he argues, his comments are not proscribed by *Rule 8.2(a)*. In support of this position, respondent would have this Court microscopically

examine the subject phrases independent of each other. He also would have this Court accept his after-the-fact characterization that his words, in sum, simply meant that the court of appeals opinion was "intellectually dishonest."

Respondent seeks to obfuscate the issue. He merely creates an "artificial dichotomy" between opinion and fact. *Milkovich v. Lorain Journal Co.,* — U.S. —, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990). In *Milkovich* the Court refused to recognize an artificial dichotomy between opinion and fact, relying instead on whether there was an assertion of objective fact:

> If a speaker says, 'In my opinion John Jones is a liar,' he implies a knowledge of facts which lead to the conclusion that Jones told an untruth. Even if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact. Simply couching such statements in terms of opinion does not dispel these implications; and the statement, 'In my opinion Jones is a liar,' can cause as much damage to reputation as the statement, 'Jones is a liar.'

*Id.,* 110 S.Ct. at 2705–06.

Respondent's statements clearly imply an assertion of objective fact regarding Judge Karohl's judicial integrity. The Master so found and this Court agrees. Respondent's language at the very least implies that the judge's conduct exhibited dishonesty and lack of integrity and is sufficiently factual to be susceptible of being proved true or false.

Respondent's continued assertion that the statement "a little bit less than honest" was simply another way of saying "intellectually dishonest" is not well taken. This Court acknowledges but does not condone the all too frequent and often imprecise, rhetorical use of the term "intellectually dishonest." In any event, in his attack on the judge respondent does not support his assignment of "dishonesty" by anything other than pointing to the long and tortuous history of armed criminal action in

Missouri and expressing his assumption that a Missouri court was again in error. Respondent does not elucidate by suggesting, for example, precedent or logic that he believes would constitute an "honest" opinion on the subject. He merely points to similar language and comments by other attorneys, including language used by some judges in dissenting opinions. It is not respondent's function, but the appropriate disciplinary committees', to initiate enforcement of the Professional Rules.

## II.

Respondent contends that construction of *Rule 8.2* or *8.4* so as to prohibit the comments made would violate both his right to free speech and his listeners' right to know as guaranteed by the First Amendment to the United States Constitution.

 It is important to note at the outset that there are no bright lines to guide courts and lawyers in determining standards to impose when balancing the state's right and need to maintain public confidence in the administration of justice with a lawyer's first amendment rights. It is clear, however, that attribution of honest error to the judiciary is not cause for professional discipline. *In re Sawyer,* 360 U.S. 622, 635, 79 S.Ct. 1376, 1382, 3 L.Ed.2d 1473 (1959). It is also clear that lawyers who make derogatory statements about judges are protected by the First and Fourteenth Amendments to the United States Constitution from imposition of civil and criminal liability unless the statement is made "with knowledge of its falsity or in reckless disregard of whether it was false or true." *Garrison v. State of Louisiana,* 379 U.S. 64, 74, 85 S.Ct. 209, 215, 13 L.Ed.2d 125 (1964).

What is not clear is whether the same degree of constitutional protection afforded in the civil and criminal arenas is required in professional disciplinary proceedings. The United States Supreme Court has not directly addressed this issue, and the state courts are in disagreement. Many courts disregard a claim of first amendment protection in disciplinary proceedings, holding that free speech does not give a lawyer the

right openly to denigrate the court in the eyes of the public. *See, e.g., In re Raggio,* 87 Nev. 369, 487 P.2d 499, 500 (1971). Other courts reject first amendment arguments in holding that an attorney's voluntary entrance to the bar acts as a voluntary waiver of the right to criticize the judiciary. *See, e.g., In re Woodward,* 300 S.W.2d 385, 393–94 (Mo. banc 1957) ("A layman may, perhaps, pursue his theories of free speech or political activities until he runs afoul of the penalties of libel or slander, or into some infraction of our statutory law. A member of the bar can, and will, be stopped at the point where he infringes our Canon of Ethics; and if he wishes to remain a member of the bar he will conduct himself in accordance therewith."); *State v. Nelson,* 210 Kan. 637, 504 P.2d 211, 214 (1972). A smaller number of courts hold that lawyers, even as participants in the administration of justice, are entitled to the full protection of the first amendment. *See, e.g., In re Hinds,* 90 N.J. 604, 449 A.2d 483, 489 (1982).

While the Supreme Court has not spoken decisively on the subject, there are several decisions by the Court that provide some guidance in determining standards by which to judge the proper role of the first amendment in disciplinary proceedings. In *Bradley v. Fisher,* 80 U.S. (13 Wall.) 335, 20 L.Ed. 646 (1872), the Court announced severe restrictions on the right of attorneys to criticize the judiciary: "[T]he obligation which attorneys impliedly assume ... when they are admitted to the bar, [is to] maintain at all times the respect due to courts of justice and judicial officers. This obligation ... includes abstaining out of court from all insulting language and offensive conduct toward the judges personally for their judicial acts." *Id.* 80 U.S. at 355. The states reacted by codifying legal ethics, culminating in the American Bar Association's issuing the Canons of Professional Responsibility in 1908. Although the Canons demanded an attitude of respect toward the courts, they also recognized the importance of and encouraged attorney criticism of the judiciary. Most judicial decisions under the Canons, however, prohibited attorney criticism without

regard to the actual effect of the statement on the public's confidence in the legal profession. Note, *Restrictions on Attorney Criticism of the Judiciary: A Denial of First Amendment Rights,* 56 Notre Dame L.Rev. 489, 491–92 (1981).

The Supreme Court next addressed sanctions against attorneys for allegedly disrespectful remarks about the judiciary in *In re Sawyer,* 360 U.S. 622, 79 S.Ct. 1376, 3 L.Ed.2d 1473 (1959). Sawyer was a defense attorney in a Honolulu trial of several people charged with conspiracy under the Smith Act. Six weeks after trial began Sawyer spoke at a meeting sponsored by the International Longshoremen's and Warehousemen's Union. Her speech was critical of the proceedings in Smith Act cases: "There is no such thing as a fair trial in a Smith Act case. All rules of evidence have to be scrapped or the Government can't make a case." Upon recommendation of the Bar Association of Hawaii, the Supreme Court of the territory of Hawaii suspended Sawyer from the practice of law for one year for impugning the integrity of the trial judge. *Id.* at 626, 79 S.Ct. at 1378. The Ninth Circuit affirmed, 260 F.2d 189 (9th Cir.1958), and the Supreme Court granted certiorari, 358 U.S. 892, 79 S.Ct. 153, 3 L.Ed.2d 119 (1958).

Justice Brennan wrote the four-judge plurality opinion reversing the Hawaii court. He began by noting that "lawyers are free to criticize the state of the law." *Sawyer,* 360 U.S. at 631, 79 S.Ct. at 1380. The freedom, however, does not include the right to "suggest any unseemly complicity by the judiciary in the practice." *Id.* at 633, 79 S.Ct. at 1381. The public attribution of honest error to the judiciary, wrote Justice Brennan, is no cause for professional discipline absent a tendency to obstruct the administration of justice. *Id.* at 635–36, 79 S.Ct. at 1382–83. The opinion delivered by Justice Brennan would prohibit only statements that tend to obstruct the administration of justice or impugn the integrity of a judge.

In a separate opinion Justice Stewart concurred in the result only because he found insufficient evidence in the record to

support the charge that Sawyer impugned the integrity of the presiding judge. He emphasized, however, that he disagreed with any intimation in the principal opinion that an attorney may invoke the constitutional right of free speech to immunize himself from evenhanded discipline for proven unethical conduct. *Id.* at 646, 79 S.Ct. at 1388 (Stewart, J., concurring). Justice Stewart adhered to the traditional notions of ethical considerations over freedom of speech: "Obedience to ethical precepts may require abstention from what in other circumstances might be constitutionally protected speech." *Id.* at 646-47, 79 S.Ct. at 1388-89.

Justice Frankfurter, joined by three other justices, dissented, finding that the record was replete with evidence to support the charge. He went on to address the "strong intimation" of the principal opinion that Sawyer's speech was protected by the first amendment. While Justice Frankfurter recognized that attorneys have certain first amendment rights to criticize judges, he maintained, however, that these rights did not extend to attorneys actively involved in pending litigation:

> Of course, a lawyer is a person and he too has a constitutional freedom of utterance and may exercise it to castigate courts and their administration of justice. But a lawyer actively participating in a trial, particularly an emotionally charged criminal prosecution, is not merely a person and not even merely a lawyer.

*Id.* at 666, 79 S.Ct. at 1398 (Frankfurter, J., dissenting). Focusing on the potential effect of such speech, Justice Frankfurter's opinion apparently would ban all critical speech by attorneys relating to pending litigation. Comment *The First Amendment and Attorney Discipline for Criticism of the Judiciary: Let the Lawyer Beware*, 15 N.Ky.L.Rev. 129, 136 (1988).

The Court shed further light in *Garrison v. State of Louisiana*, 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964). Garrison, district attorney of Orleans Parish, Louisiana, was convicted of criminal defamation for statements made at a press conference which disparaged the judicial conduct of eight judges of the Criminal District Court of the parish. The Court first held that the *New York Times* rule applied in criminal as well as civil actions. This rule provides that critics of public officials may not be subjected to civil sanctions unless the statement was made with knowledge that it was false or with reckless disregard of whether it was false or not. *New York Times Co. v. Sullivan*, 376 U.S. 254, 279-80, 84 S.Ct. 710, 725-26, 11 L.Ed.2d 686 (1964). The *Garrison* court held that "only those false statements made with the high degree of awareness of their probable falsity demanded by *New York Times* may be the subject of either civil or criminal sanctions." *Garrison*, 379 U.S. at 74, 85 S.Ct. at 216.

■ These cases and others make clear that speech concerning public officials, including judges, may be protected speech, "[f]or speech concerning public affairs is more than self-expression; it is the essence of self-government." *Id.* at 74-75, 85 S.Ct. at 215-216. *See also Landmark Communications, Inc. v. Virginia*, 435 U.S. 829, 838-39, 98 S.Ct. 1535, 1541-42, 56 L.Ed.2d 1 (1978) (A primary purpose of the first amendment is to protect the free discussion of governmental affairs, including the operations of the courts and the judicial conduct of judges.). The principle that "debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials" is no less important when the judiciary is involved. *Garrison*, 379 U.S. at 75, 85 S.Ct. at 216, quoting *New York Times*, 376 U.S. at 270, 84 S.Ct. at 720.

■ There are limitations, however, to first amendment protection. Even protected speech may be regulated. Where unbridled speech amounts to misconduct that threatens a significant state interest, the state may restrict a lawyer's exercise of personal rights guaranteed by the Constitution. *See NAACP v. Button*, 371 U.S. 415, 438, 83 S.Ct. 328, 340, 9 L.Ed.2d 405 (1963). Restrictions on free speech, however, will survive judicial scrutiny only if

the limitation furthers an important or substantial governmental interest and is no greater than necessary or essential to the protection of the particular governmental interest involved. *Sable Communications of California, Inc. v. F.C.C.*, 492 U.S. 115, 109 S.Ct. 2829, 106 L.Ed.2d 93 (1989). A determination of whether the conditions have been met necessarily requires a balancing process. *See L. Tribe, American Constitutional Law* § 12–2, at 792–93 (2d ed.1988). The Court balances the competing considerations of the individual's interest in expressing certain ideas against the government's interests in and justifications for restricting such expression. *See Bates v. State Bar of Arizona*, 433 U.S. 350, 363–65, 97 S.Ct. 2691, 2698–2700, 53 L.Ed.2d 810, *reh'g denied*, 434 U.S. 881, 98 S.Ct. 242, 54 L.Ed.2d 164 (1977).

In undertaking the weighing process, it is necessary to evaluate the nature and importance of the interest of the state sought to be advanced through the restriction of expression. It is clear that the state has a substantial interest in maintaining public confidence in the administration of justice. The interest is not only the litigant's but also the public's. The interest is in the administration of justice by a fair and impartial judiciary. The right to remedy by appeal is part of this system. Consequently, the public's confidence in the appellate process is vital.

Lawyers are an integral part of and essential to the administration of justice. As officers of the court, lawyers do not stand in the shoes of ordinary citizens. *See Middlesex County Ethics Committee v. Garden State Bar Ass'n*, 457 U.S. 423, 434, 102 S.Ct. 2515, 2522, 73 L.Ed.2d 116 (1982) ("The judiciary as well as the public is dependent upon professionally ethical conduct of attorneys and thus has a significant interest in assuring and maintaining high standards of conduct of attorneys engaged in practice."); *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 792, 95 S.Ct. 2004, 2016, 44 L.Ed.2d 572 (1975) ("We recognize that the States have a compelling interest in the practice of professions within their boundaries.... The interest of the States in regulating lawyers is especially great since

lawyers are essential to the primary governmental function of administering justice, and have historically been 'officers of the courts.' "). Lawyers must execute their professional responsibilities ethically and pursuant to rules, carefully considered, in order to ensure the confidence of both litigants and the public. Statements by a lawyer impugning the integrity and qualifications of a judge, made with knowledge of the statements' falsity or in reckless disregard of their truth or falsity, can undermine public confidence in the administration and integrity of the judiciary, thus in the fair and impartial administration of justice.

■■■■ *Rule 8.2(a)* contemplates and seeks to effect the substantial government interest in administration of justice through a fair and impartial judiciary. It is this substantial state interest that guides this Court in its interpretation of *Rule 8.2(a)*. The comments to the rule also recognize, however, that the public's interest in the proper administration of justice may be served through criticism of the process. The rule, then, is sensitive to the possibility of its chilling effect and will not be interpreted to silence all lawyer criticism of the judicial system. Discipline, if imposed, is imposed not as punishment against the offender, but in protection of the public. *In re Hardge*, 713 S.W.2d 503, 505 (Mo. banc 1986).

Further construction of *Rule 8.2(a)* requires that the term "false or with reckless disregard as to its truth or falsity" be defined. The cases have consistently required subjective knowledge of the falsity of one's statement before sanctions were imposed. There is no one infallible definition of "reckless disregard." *St. Amant v. Thompson*, 390 U.S. 727, 730, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968). The standard has often been defined as an awareness of the likelihood of the circulation of false information or a high degree of awareness of probable falsity. *See, e.g., id.* at 731, 88 S.Ct. at 1325. In defamation actions the standard has consistently been a subjective one—the test not being whether a reasonably prudent person would have

had serious doubts as to the truth of the publication, but whether the defendant in fact entertained such doubts. *Id.*

It is not clear, however, whether the "with knowledge or in reckless disregard" standard used in defamation cases must be strictly applied in disciplinary proceedings. *But see Garrison,* 379 U.S. at 73, 85 S.Ct. at 215 ("Moreover, even where the utterance is false, the great principles of the Constitution which secure freedom of expression in this area preclude attaching adverse consequences to any except the knowing or reckless falsehood."). Some courts have simply refused to apply the *New York Times* test, holding that it was inapplicable to a disciplinary proceeding. *See Matter of Johnson,* 240 Kan. 334, 729 P.2d 1175, 1180–81 (1986); *Matter of Terry,* 271 Ind. 499, 394 N.E.2d 94, 95 (1979), *cert. denied sub nom., Terry v. Indiana Supreme Court Disciplinary Comm'n,* 444 U.S. 1077, 100 S.Ct. 1025, 62 L.Ed.2d 759 (1980). Other courts have in dicta indicated that the *New York Times* test is applicable in disciplinary proceedings. *See Eisenberg v. Boardman,* 302 F.Supp. 1360, 1362 (W.D.Wis.1969); *State Bar v. Semaan,* 508 S.W.2d 429, 432–33 (Tex.Civ. App.1974). Some courts appear to apply the *New York Times* test, but it is unclear whether they are applying the same subjective "with knowledge or in reckless disregard" standard. *See, e.g., Ramirez v. State Bar of California,* 28 Cal.3d 402, 169 Cal.Rptr 206, 211, 619 P.2d 399, 404 (1980).

■ At least one court has directly addressed the question and concluded that an objective rather than subjective standard should be used. *In re Disciplinary Action Against Graham,* 453 N.W.2d 313 (Minn.), *cert. denied sub nom. Graham v. Wernz,* —— U.S. ——, 111 S.Ct. 67, 112 L.Ed.2d 41 (1990). *See also Louisiana State Bar Ass'n v. Karst,* 428 So.2d 406, 409 (La.1983). In *Graham* the Supreme Court of Minnesota held that the proper standard in attorney discipline cases "must be an objective one dependent on what the reasonable attorney, considered in light of all his professional functions, would do in the same or similar circumstances." *Id.* at

322. Minnesota's rule is identical to this Court's *Rule 8.2(a),* and also identical to *Rule 8.2,* American Bar Association Model Rules of Professional Conduct. The *Graham* court noted that *Rule 8.2(a),* on its face, rejects an absolute privilege for false statements made by a lawyer with reckless disregard for the falsity. The court noted that the rule's language itself is consistent with the constitutional limitations placed on defamation actions by the United States Supreme Court cases of *New York Times* and *Garrison. Id.* at 321. The court concluded, however, that because of the interest in protecting the public, the administration of justice, and the profession, a purely subjective standard is inappropriate. *Id.* at 322. Citing the differences between defamation (a personal wrong with a personal redress) and professional discipline (redress of a public wrong) the court decided that attorneys should be held to a higher standard when leveling criticism that may adversely affect the administration of justice.

> This court certifies attorneys for practice to protect the public and the administration of justice. That certification implies that the individual admitted to practice law exhibits a sound capacity for judgment. Where an attorney criticizes the bench and bar, the issue is not simply whether the criticized individual has been harmed, but rather whether the criticism impugning the integrity of judge or legal officer adversely affects the administration of justice and adversely reflects on the accuser's capacity for sound judgment. An attorney who makes critical statements regarding judges and legal officers with reckless disregard as to their truth or falsity ... exhibits a lack of judgment that conflicts with his or her position as "an officer of the legal system and a public citizen having special responsibility for the quality of justice." Minn.R.Prof.Conduct, Preamble.

*Id.* This Court agrees with the reasoning and holding of the *Graham* court. The objective standard survives first amendment scrutiny in light of the compelling state interests served.

■ It remains to determine whether respondent violated the rule. The findings

and conclusions of the Master stated that respondent did in fact act with reckless disregard as to the truth or falsity of the statements made regarding Judge Karohl. This Court agrees. When asked about the statement that the judge "made up his mind before he wrote the decision," respondent testified that he meant "that he'd made up his mind before he got the case," and that his intent was to convey the message that he felt Judge Karohl's opinion was a foregone conclusion. As stated above, respondent asserted that he meant that the opinion was "intellectually dishonest" but when asked to explain how the opinion was dishonest, respondent merely referred again to his view that the "Missouri appellate system has been intellectually dishonest concerning armed criminal action from day one, in that they steadfastly refuse to follow the directives of the highest court in the land ... and I anticipated the same thing would happen again." Before making these statements about Judge Karohl, respondent failed to investigate to determine whether Judge Karohl had participated in any cases involving the armed criminal action issue, authored any opinions on the subject, or expressed any personal opinions about it.

Without any corroborative evidence, respondent accused Judge Karohl of deliberate dishonesty. He accused the judge of purposefully ignoring the law to achieve his personal ends. His was not an implication of carelessness or negligence but of a deliberate, dishonest, conscious design on the part of the judge to serve his own interests. That respondent now seeks to negate the Master's findings and conclusions by saying that respondent meant only to characterize the court of appeals opinion as being "intellectually dishonest" refutes neither the actual language used by respondent at the press conference nor respondent's failure legitimately to criticize the reasoning and the holding of the court of appeals opinion. Without investigation, however, and knowing the court's inability to respond to accusations of unspoken motive, respondent proceeded to make a publicly televised statement alleging purposefully dishonest conduct. Respondent's con-

duct reflects a reckless disregard for the truth or falsity of the statements made. This Court has already concluded, *supra*, that respondent's statements imputed lack of integrity and misconduct in the judge's professional work. His statements were without basis; the court of appeals opinion relied on the teaching of *Missouri v. Hunter*. Respondent's conduct was prejudicial to the administration of justice and reflects adversely on respondent's fitness to practice law. Accordingly, this Court now finds that by reason of this conduct, the respondent violated *Rule 8.2(a)* of the Rules of Professional Conduct.

This Court must now assess an appropriate disciplinary sanction by reason of the misconduct found in this case. Respondent argues that as an elected public official, he was using the only practicable means of communicating with his constituents. It is true that public figures and those speaking on public matters should not be held in fear of retribution for their *every word*. Respondent is nevertheless subject to the Rules of Professional Conduct and does not enjoy a privilege recklessly to impugn before the public the integrity of the judiciary. While deference is given to the needs of public officials to be free from a chilling effect, the mere holding of public office does not exempt a lawyer from the operation of the Rules of Professional Conduct. Respondent notes that he did not engage in bribery of jurors, subornation of perjury, misrepresentation to a court, or any similar kind of conduct. This is correct. Furthermore, this Court independently notes that respondent did not accuse the judge of criminal conduct or of being subject to inappropriate influence.

The Master noted that respondent has privately stated his belief in the judge's personal integrity and that at the committee hearing respondent reported that he had privately apologized to Judge Karohl before the hearing. The Master found this to be a mitigating circumstance but noted as an aggravating circumstance respondent's failure to make similar public apology and thereby alleviate the damage caused to the court of appeals and the

judge. There are other aggravating circumstances. At the time respondent made the statements, the case remained pending. *See Nelson,* 210 Kan. 637, 504 P.2d 211, 215. Avenues for complaint were available in the form of a motion for rehearing as well as through the filing of a complaint with the Commission on Retirement, Removal and Discipline. *See Matter of Riley,* 142 Ariz. 604, 691 P.2d 695, 705 (banc 1984); *In re Lacey,* 283 N.W.2d 250, 252 (S.D.1979). To date, respondent has continuously and steadfastly refused to deviate from his original position, even in the light of subsequent legal proceedings, none of which disturbed either the holding or the reasoning of the court of appeals opinion. As the Master noted, respondent's twenty years' experience as a prosecutor "belies any suggestion that he may have acted inadvertently or mistakenly, but rather that he did so knowingly or recklessly of the damage he would cause. The only apparent conclusion is that the very unusual and sensational aspects of the case afforded him an opportunity of personal publicity and self-aggrandizement which he utilized without reflection upon the serious consequences entailed."

This Court recognizes that it is possible for a lawyer to charge a judge with misconduct more egregious than that charged in the present case. This Court also recognizes that this case involves a matter of first impression and initial construction of *Rule 8.2(a)* and that the purpose of the rule is to protect the public. Under these circumstances, a public reprimand is appropriate.

The charges brought under *Rule 8.4* are encompassed within the violation of *Rule 8.2(a)* in this case and, for purposes of imposition of discipline, cannot be distinguished.

Respondent is reprimanded and directed to pay the costs of these proceedings.

ROBERTSON, RENDLEN, HIGGINS, and HOLSTEIN, JJ., concur.

ROBERT E. SEILER, Senior Judge, concurs in separate opinion filed.

BLACKMAR, C.J., dissents in separate opinion filed.

BILLINGS, J., not sitting.

ROBERT E. SEILER, Senior Judge, concurring.

In my opinion, there is no question but that Mr. Westfall in his television interview maliciously or recklessly made a false statement that Judge Karohl wrote his *Bulloch* opinion to satisfy his own personal views, using less than honest reasons to do so (which opinion, incidentally, in its result necessarily exposed Mr. Westfall's ignorance of the law of double jeopardy, no doubt thereby arousing his pique).

Mr. Westfall's self-serving protestations that he had "respect for Judge Karohl", did not question his personal integrity "in the least" and had never intended to "impugn or question Judge Karohl's personal integrity", made months later, only after disciplinary charges had been filed against him, in no way change the spirit behind what he said about Judge Karohl in the television interview.

Clearly, under any test, Mr. Westfall's conduct is a violation of Rule 8.2(a) for which he deserves discipline. None of the many cases cited in the opinions herein would require otherwise.

My belief is that it is not necessary or desirable to reach any conclusion in this case as to whether the same degree of constitutional protection afforded speech in civil and criminal cases is required in lawyer disciplinary cases.

I concur in the judgment of discipline by reprimand.

BLACKMAR, Chief Justice, dissenting.

We should proceed very carefully when we are asked to censor or to censure political speech. Words spoken about an opinion by a judge who is subject to the periodic scrutiny of the voters, by an elected prosecuting attorney and potential candi-

date, relating to an important criminal matter, epitomize political expression.

The words were spoken during an interview with a television reporter. These reporters fire streams of questions, using the responses they deem most newsworthy. These are often the most vivid.[1] Such give and take is a part of the political process, and should not be discouraged by the threat of hypercritical scrutiny.

The interview came the day the criticized opinion was handed down. The respondent was entitled to share his overview of the course of decisions, without detailed legal research, before he spoke with the reporter. Nor was he required to withhold comment until the motion for rehearing was disposed of. An opinion is news when it is handed down. Motions for rehearing are usually formalities, often sought but seldom successful.[2] There is absolutely nothing in the record indicating that the respondent was trying to bring public pressure on the author of the opinion, or the other judges of his court, to grant a rehearing. He rather assumed a martyred pose in suggesting that the bench was not sympathetic to his aims.

In *State v. Nelson*, 210 Kan. 637, 504 P.2d 211 (1972) the Supreme Court of Kansas declined a request for discipline of an attorney who had criticized a decision of that court, disciplining him, when he was approached by an interviewer shortly after the handdown. The court perceived a "situation replete with emotion and acrimony," and noted "the fact that the statements attributed to the respondent, were generally in broad terms." *Id.* 504 P.2d at 217. It took the very practical course of dismissing the petition. It would be wise for us to do likewise.

I do not argue that a prosecuting attorney enjoys superior privileges with regard to political speech. His office simply demonstrates the political nature of his speech. Like rights are necessarily available to his critics. Nor do we have to speculate at this point as to whether a lawyer's privilege of comment is greater in a case involving important public interests than in matters of purely private concern.

At the formal hearing before the Advisory Committee the respondent testified as follows:

MR. SCULLY: Mr. Westfall, do you think in this particular instance that you could have criticized the opinion of the Appellate Court in a different fashion?

A. Sure. I told Judge Karohl this before we came in here, I saw him and I did something I've been wanting to do but I don't see him often, I went over to say good morning to him and if he seemed okay to shake his hand. I said Judge, I want to say to you face-to-face, not to influence the outcome of this hearing but we're here, I did not mean to impune [sic] or to question your personal integrity and I feel badly if that's the inference you drew or your family or some of your friends or colleagues have drawn. My purpose was to criticize the opinion, I still feel it was wrong, I still feel I have the right and obligation to my constituents to say those things and I'll again given a similar situation I may be a bit more cautious to not reflect upon one's personal integrity but that's a tough thing to do and he sort of made it clear that he understood that dealing with the media is tough because they put on what they want to put on so I made that clear to him.

The disposition of this case is solely our responsibility. We owe no deference to any other tribunal. We are the fact finder. There are no significant credibility calls in the master's report, and I find no indication that he did not consider the respondent to be a credible witness. We must also eschew forbidden intrusions on the field of free expression. *Bose Corp. v. Consumers*

---

1. The principal opinion faults the respondent for asking us to "microscopically examine the subject phrases independent of each other," even though the broadcast consisted of disjointed segments selected by the editors rather than a continuous discourse.

2. The motion for rehearing, of course, is a condition precedent to further review. *Rules* 84.17, 83.03.

*Union of U.S., Inc.,* 466 U.S. 485, 499, 104 S.Ct. 1949, 1958, 80 L.Ed.2d 502 (1984).

A public reprimand is a substantial sanction, which must be administered only in accordance with due process of law. *In re Voorhees,* 739 S.W.2d 178, 180 (Mo. banc 1987), citing *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio,* 471 U.S. 626, 636–37, 105 S.Ct. 2265, 2274–75, 85 L.Ed.2d 652 (1985). The reprimand is a scar on the lawyer's record and, in a case impacting the First Amendment, has an obvious chilling effect on further expression. We are not at liberty to give a lawyer a "chewing" for rudeness or insolence not committed in the presence of the court.

The judgment of reprimand is faulty, first because no violation of Rule 8.2 has been established; second, because the respondent's speech is protected under the First Amendment and Art. I, Sec. 8, of the Missouri Constitution; and, third, because of the oppressive conduct of the Advisory Committee.

### 1. *There is no Rule Violation*

Rule 8.2 is narrowly drafted, virtually in terms of the standard of *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). There may be no discipline except for a

> statement that the lawyer knows to be false or with reckless disregard of its truth or falsity concerning the qualifications or integrity of a judge.

The rule pointedly makes no reference to disrespect, discourtesy, or similar impropriety. It is directed at calumny; not at indiscreet or extravagant expression. *See Seested v. Post Printing & Pub. Co.,* 326 Mo. 559, 31 S.W.2d 1045, 1052 (1930); *Diener v. Star–Chronicle Pub. Co.,* 232 Mo. 416, 135 S.W. 6, 9 (1911); *Williams v. Gulf Coast Collection Agency Co.,* 493 S.W.2d 367, 369 (Mo.App.1973). The evidence does not demonstrate knowing or reckless falsehood as the rule requires.

The most offensive part of the interview states, "for reasons that I find somewhat illogical, and I think even a little bit less than honest, Judge Karohl ..." Elementary grammar teaches that what the respondent suggested were "a little bit less than honest" were the reasons, not the judge. Any contrary conclusion is a distortion of his language. The coupling of the offensive phrase with "illogical" is a further demonstration that the respondent is commenting on the reasons.

The principal opinion seeks to bolster its construction by at least six unsupportable paraphrases of the respondent's actual words. He did not "specifically refer to [the judge's] ... integrity as it relates to his participation in the appellate judicial process." There is no "assertion of objective fact regarding Judge Karohl's judicial integrity." There is no implication "that the judge's conduct exhibited dishonesty and lack of integrity...." The statements that respondent "accused the judge of purposefully ignoring the law to achieve his personal ends" or implied "a deliberate, dishonest, conscious design on the part of the judge to serve his own interests," or that his statements "imputed lack of integrity and misconduct in the judge's professional work," are the words of the writer, not the words of the respondent. This treatment of his words highlights the danger in seeking discipline for expressions about public matters and will give great concern to any lawyer, whether holding office or not, or to any law professor who values a law license, about any criticism of a judge or a judicial opinion. "[S]peech concerning public affairs is more than self-expression; it is the essence of self-government." *Garrison v. Louisiana,* 379 U.S. 64, 74–75, 85 S.Ct. 209, 215–216, 13 L.Ed.2d 125 (1964). The United States Supreme Court has frequently reiterated its holding that speech on matters of public concern occupies the "highest rung of the hierarchy of First Amendment values, and is entitled to special protection." *Connick v. Myers,* 461 U.S. 138, 145, 103 S.Ct. 1684, 1689, 75 L.Ed.2d 708 (1983) (quotation omitted). *See also Philadelphia Newspapers, Inc. v. Hepps,* 475 U.S. 767, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986).

Judge Karohl himself apparently did not think that he had been accused of dishonesty. He testified as follows:

In my present opinion of his words this is a criticism of our opinion.

\* \* \* \* \* \*

Q. Well, you know from talking to Mr. Westfall that he certainly meant to criticize your opinion; isn't that correct?

A. I haven't any doubt he was criticizing the opinion from taking all of the words he used.

The principal opinion makes much of the use of "Judge Karohl" rather than "the court." This is hardly a significant or substantial distinction, in view of our practice, along with almost all American collegial courts, of speaking through opinions prepared by one member and bearing the author's name. The later use of the name and of the singular personal pronouns does not, by any reasonable construction, convert a statement about the reasons in an opinion to a statement about a judge's integrity.

Other portions of the interview simply charge that the opinion is result oriented. This assertion is frequently made about judicial opinions, and cannot be found to be a statement of fact. As Justice Holmes was fond of pointing out, judicial opinions are impacted by the judges' inarticulate major premises.[3] Members of the public have the right to comment about their perception of these premises. Some judges may be branded "plaintiff minded," others are "tools of the insurance companies." Some are "law and order" to one segment of the public but "hanging judges" to others. Some are said to be "tyrants;" others "wimps." Characterizations such as these are not the subject of discipline. Nor is there vice in the statement about what the judge "personally likes." All judges have notions about the shape the law should take and hope that their views find favor with their colleagues.

Least supportive of all of the discipline imposed is the statement that "he made up his mind before he wrote the decision, and just reached the conclusion he wanted to reach." Judge Karohl testified that he was one of the members of a writ division which voted to issue a preliminary order in prohibition. Extraordinary writs are grudgingly issued in Missouri, and a judge who votes to issue a preliminary order very likely has a rather strong feeling that relief should be granted. Tentative views are subject to further briefing and oral argument, but writs to stop criminal cases are so rare that, when one is issued, the prosecutor has reason for apprehension. The respondent's realistic analysis of the decisional process does not demonstrate a knowing or reckless falsehood.

The historical development of the Missouri law of libel is helpful in demonstrating how allegedly defamatory words should be construed. In many cases over the years it is said that a plaintiff will not be allowed to place a strained and unnatural construction on language in order to support a claim of libel. *Diener v. Star–Chronicle Pub. Co.*, 232 Mo. 416, 135 S.W. 6, 9 (1911); *Thomson v. The Kansas City Star Co.*, 387 S.W.2d 493, 498 (Mo. banc 1965) and *Jacobs v. Transcontinental & Western Air*, 358 Mo. 674, 216 S.W.2d 523, 525 (1948). Innuendo is permissible only if it is fairly supported by the actual words. *Langworthy v. Pulitzer Pub. Co.*, 368 S.W.2d 385, 389 (Mo.1963); *Swafford v. Miller*, 711 S.W.2d 211, 213–14 (Mo.App. 1986). The principal opinion uses phrases such as "respondent's statements clearly imply" and "respondent's language at the very least implies." To speak in this manner is to concede that the respondent's words do not say what the prosecution would have them say. There is no reason why defamation cases, even though serving a somewhat different purpose, should not be helpful when problems of construction are presented in a disciplinary case.[4]

Missouri, furthermore, has always recognized the distinction between defamatory statements of fact and statements of opinion, not grounded in objective fact. *Henry v. Halliburton*, 690 S.W.2d 775, 786–87

---

**3.** *Lochner v. People of State of New York*, 198 U.S. 45, 76, 25 S.Ct. 539, 547, 49 L.Ed. 937 (1905).

**4.** *See Swafford v. Miller*, 711 S.W.2d 211, 213 (Mo.App.1986).

(Mo. banc 1985); *Willman v. Dooner,* 770 S.W.2d 275, 278 (Mo.App.1989). We respect people's right to express their views, especially on matters of public concern. *Henry v. Halliburton,* 690 S.W.2d at 784–85 (published column and subsequent copy calling life insurance agent, identified in broad terms, "fraud" or "twister" an expression of opinion and not actionable); *Anton v. St. Louis Suburban Newspapers, Inc.,* 598 S.W.2d 493, 499 (Mo.App. 1980) (remark that lawyer engaged in "sleazy" dealings an expression of opinion and not actionable); *Greenbelt Co-op. Pub. Ass'n v. Bresler,* 398 U.S. 6, 90 S.Ct. 1537, 26 L.Ed.2d 6 (1970) (use of term "blackmail" in characterizing negotiating position of public figure securing zoning variances was neither slander nor libel). The principal opinion asserts that the respondent "seeks to obfuscate the issue" by suggesting a distinction between fact and opinion, quoting from the case of *Milkovich v. Lorain Journal Co.,* — U.S. —, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990). With due respect, the obfuscation comes from the principal opinion.

In *Milkovich,* a newspaper published an editorial in which it was strongly intimated that the plaintiff and others had perjured themselves at a public hearing. The Supreme Court said simply that defamatory statements of fact might support a judgment for libel, even though they were prefaced by a phrase such as "in my opinion," if the speaker suggests personal knowledge of the defamatory facts stated. This case is entirely different, for lack of tangible statements of fact. *Milkovich* is consistent with *Restatement (Second) of Torts,* § 566 (1965), with the general principles of Missouri law as exemplified by our decisions, and with prior Supreme Court cases, which it cites at length. It certainly does not require this Court to abandon the historic distinction between statements of fact and statements of opinion. "[A] statement of opinion relating to matters of public concern which does not contain a provably false factual connotation will receive full constitutional protection." *Milkovich,* 110 S.Ct. at 2706 (citation omitted). If we were to abandon the historic distinction we would reject the wisdom of decades.

The proof is also deficient in the required showing that the statement was one which "the lawyer knows to be false or [was made] with reckless disregard of its truth or falsity." Rule 8.2 requires a purpose to cause harm through defamation. *See New York Times,* 376 U.S. at 279–83, 84 S.Ct. at 725–28, and Part 2, *infra.* There is no support for a finding that the respondent had any purpose other than to denounce the opinion. Counsel for the informants, in response to my question at oral argument, said that their strongest case is *In re Sawyer,* 360 U.S. 622, 79 S.Ct. 1376, 3 L.Ed.2d 1473 (1959), which the principal opinion discusses at length. For reasons that follow in Part 2, *infra,* the case does not give any support to the result.

Nor is there support for the claim that the statement was "knowingly or recklessly made." "Recklessness" as applied to speech is not the equivalent of "popping off." There must be an intent to injure before there is occasion for the determination of recklessness. There is no showing here of "false statements made with the high degree of awareness of their probable falsity" required by *Garrison v. Louisiana,* 379 U.S. 64, 74, 85 S.Ct. 209, 215, 13 L.Ed.2d 125 (1964), discussed in Part 2, *infra.*

Because we are the fact finder, we should not disregard the respondent's testimony. He agreed that he should have spoken more carefully, and said that other portions of the interview which the newspeople did not see fit to air made his purpose clearer. He stated positively that he had no purpose of questioning the judge's integrity and that he should have phrased his comments in a different way. Distinctions based on whether he said "the court" rather than "Judge Karohl," or "intellectually dishonest" rather than "a little bit less than honest," show no more than negligence, and do not establish recklessness by the standard the law requires. *Garrison v. Louisiana,* 379 U.S. at 79, 85 S.Ct. at 218.

No case cited in the principal opinion involves facts even close to this one. Several of the cases cited have assessed discipline when a lawyer has made unequivocal statements charging one or more judges, or judges acting in concert with others, of fraud, corruption or conspiracy in the disposition of particular cases. *Matter of Terry*, 271 Ind. 499, 394 N.E.2d 94 (1979); *Ramirez v. State Bar of California*, 28 Cal.3d 402, 169 Cal.Rptr. 206, 619 P.2d 399 (1980); *Louisiana State Bar Ass'n v. Karst*, 428 So.2d 406 (La.1983); *In re Disciplinary Action Against Graham*, 453 N.W.2d 313 (Minn.) *cert. denied sub nom. Graham v. Wernz*, — U.S. —, 111 S.Ct. 67, 112 L.Ed.2d 41 (1990). These cases are similar to our own opinion in *Matter of Alexander*, 807 S.W.2d 70 (Mo. banc 1991), which properly points to the need for protecting the public from a lawyer who makes unfounded accusations for which no support is furnished, even though the lawyer, out of paranoia or other eccentricity, may believe the charges to be true. All involved unsupportable false charges of criminal or conspiratorial conduct, and do not support the holding of this case.

I would commend the approach of such cases as *State v. Nelson*, 210 Kan. 637, 504 P.2d 211 (1972); *State Bar v. Semaan*, 508 S.W.2d 429 (Tex.Civ.App.1974); *State ex rel. Oklahoma Bar Ass'n v. Porter*, 766 P.2d 958 (Okl.1988); *In re Hinds*, 90 N.J. 604, 449 A.2d 483 (1982); and *Matter of Keller*, 213 Mont. 196, 693 P.2d 1211 (1984), in which the courts have recognized that discipline for speech should not lightly be decreed.

I do not admire the respondent for speaking as he did. His remarks could be described as intemperate, disrespectful, discourteous, poorly informed, and with a plethora of similar adjectives. He is an ambitious politician with a penchant for publicity. Perhaps he had a defense reaction to the disappointing verdict in a major case. The informants must still demonstrate violation of a narrowly drawn rule.

## 2. *The First Amendment Issue*

The respondent places prime reliance on the landmark case of *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), which held that even false statements are subject to constitutional protection in defamation actions if they concern public issues and public figures. The defamation plaintiff must show malice, which may be found if a false and defamatory statement is wilfully or recklessly made. *Id.* at 279–80, 84 S.Ct. at 725–26. This holding introduces a new element into the law when it is sought to impose sanctions on expression. The holding was made applicable to criminal cases in *Garrison v. Louisiana*, 379 U.S. at 67, 74, 85 S.Ct. at 212, 215, demonstrating that the rationale and holding of *New York Times* apply with no less force when the remedy is criminal.

The principal opinion suggests, however, that

What is not clear is whether the same degree of constitutional protection afforded in civil and criminal arenas is required in professional disciplinary proceedings.

The answer, I submit, is quite clear. Lawyers do not surrender their First Amendment rights when they accept their licenses. *See Bates v. State Bar of Arizona*, 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977); *In re R.M.J.*, 455 U.S. 191, 102 S.Ct. 929, 71 L.Ed.2d 64 (1982); *reversing Matter of R.M.J.*, 609 S.W.2d 411 (Mo. banc 1980). *NAACP v. Button*, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963); *In re Primus*, 436 U.S. 412, 98 S.Ct. 1893, 56 L.Ed.2d 417 (1978). These cases demonstrate that First Amendment rights must be respected in disciplinary actions, and put a substantial burden on the states to show compelling public interest in order to support limitations on freedom of expression. There must be narrowly drawn rules to protect a compelling public interest. The principal opinion suggests that the public interest involved in disciplinary actions supports stricter controls over freedom of expression. *Garrison* refutes this claim, because it too involved the vindication of public rights rather than private rights. Pro-

fessional discipline can be fully as chilling of expression as can criminal prosecution.[5]

The principal opinion adduces scanty and obsolescent authority for the proposition that the First Amendment does not apply to, or has limited application to, lawyer discipline cases. Some of the cases are pre-*New York Times* and most are pre-*Bates.* The more recent and better considered cases recognize that First Amendment protection applies with full force.[6] The quotation from our case of *In re Woodward,* 300 S.W.2d 385, 393–94 (Mo. banc 1957) must be read in the light of the numerous intervening Supreme Court decisions demonstrating that courts are seriously limited in sanctioning lawyers for what they say, and that disciplinary rules must consist with the First Amendment.

*Bradley v. Fisher,* 80 U.S. (13 Wall.) 335, 20 L.Ed. 646 (1871), decided in interesting historical context, is of no help at all in our present inquiry because it dealt with a personal confrontation between a lawyer and a judge during a recess in a trial. The case involved a damage suit by a lawyer against a judge and presented several issues, none germane to the present inquiry.

The principal opinion finds solace in a Minnesota case, *In re Disciplinary Action Against Graham,* 453 N.W.2d 313 (Minn.), *cert. den. sub nom. Graham v. Wernz,* — U.S. ——, 111 S.Ct. 67, 112 L.Ed.2d 41 (1990), which is said to present an "objective" rather than a "subjective" test for the element of knowing and reckless falsehood in disciplinary cases. There a lawyer who lost a case charged the presiding judge with conspiring with others to deprive his client of his rights. At his disciplinary hearing he offered no evidence in support of the charges, but sought to defend on the basis that he believed the charges to be true. The court held that this professed belief could not refute the charge of recklessness. The case is in line with cases cited in Part 1, above, in which lawyers have been disciplined for charging judges with criminal or conspiratorial conduct, and with our recent case of *Matter of Alexander, supra,* but bears not the slightest similarity to this case.

Lawyers possess First Amendment rights. Before a court can legitimately impose discipline, chilling the First Amendment, the state must articulate a compelling interest. This the Advisory Committee has not done.

In *Landmark Communications, Inc. v. Virginia,* 435 U.S. 829, 838–39, 98 S.Ct. 1535, 1541–42, 56 L.Ed.2d 1 (1978), the Court held that the state's interest in maintaining the confidentiality of judicial disciplinary proceedings did not justify a sanction against a newspaper which published an article about pending proceedings. This also emphasizes that lawyer and judicial discipline must be exercised in a manner consistent with the First Amendment.

Pertinent also is the trilogy of *Bridges v. State of Cal.,* 314 U.S. 252, 62 S.Ct. 190, 86 L.Ed. 192 (1941); *Pennekamp v. State of Fla.,* 328 U.S. 331, 66 S.Ct. 1029, 90 L.Ed. 1295 (1946); and *Craig v. Harney,* 331 U.S. 367, 67 S.Ct. 1249, 91 L.Ed. 1546 (1947), in which the Court established a rule that a purpose of maintaining respect for the courts does not justify contempt sanctions such as have been fairly common in the past for criticism of a judge's conduct in a pending case. The Court explained that the right of freedom of speech includes the right to criticize courts. The trilogy suggests that judges must have thick skins and do not require protection from criticism unless there is malicious defamation. First Amendment interests far outweigh a purpose of "maintaining respect for the courts." *See also Cohen v. California,* 403 U.S. 15, 22–26, 91 S.Ct. 1780, 1786–1789, 29 L.Ed.2d 284 (1971).

---

**5.** In *Gentile v. State Bar of Nevada,* 106 Nev. 60, 787 P.2d 386 (1990), the Supreme Court of Nevada tried to one-line the First Amendment issue in a disciplinary action involving a lawyer's public statement of his client's innocence of pending charges. The Supreme Court granted certiorari and the case has been argued.

**6.** *State ex rel. Oklahoma Bar Ass'n v. Porter,* 766 P.2d 958 (Okl.1988); *Matter of Keller,* 213 Mont. 196, 693 P.2d 1211 (1984); *In re Hinds,* 90 N.J. 604, 449 A.2d 483 (1982); *State v. Nelson,* 210 Kan. 637, 504 P.2d 211 (1972); *State Bar v. Semaan,* 508 S.W.2d 429 (Tex.Civ.App.1974).

The Advisory Committee failed to prove that the statement was one which "the lawyer knows to be false or [was made] with reckless disregard of its truth or falsity." Rule 8.2 is embodied in the *New York Times* standard for proving defamation. *New York Times*, 376 U.S. at 279–80, 84 S.Ct. at 725–26. Actual malice denotes a purpose to cause harm through defamation. *Id.* at 279–83, 84 S.Ct. at 725–28.

The principal opinion points out that the respondent testified at the formal hearing that he did not mean to impugn the integrity of Judge Karohl, and that he did not believe, and did not mean to suggest, that the judge was not honest. The informants, incredibly, use this testimony as evidence that he knowingly spoke falsehoods when only a loose tongue is indicated. The principal opinion does not appear to go this far, but seizes on his admissions as indication that he acted "with reckless disregard as to the truth or falsity of the statements...." In so holding, the opinion misses the point of the requirement of scienter.

Contrary to the Committee's position, *In re Sawyer*, 360 U.S. 622, 79 S.Ct. 1376, 3 L.Ed.2d 1473 (1959), provides no support for the principal opinion's remarkable conclusion that respondent spoke knowing falsehoods. A majority of the justices found that Sawyer was not charged with and could not be found to have attempted to obstruct the proceedings in an ongoing trial. The majority went on to conclude that her statements, which are much more disparaging and inflammatory than anything in this case, could not properly be construed as a personal attack on the single judge who was hearing the case. The four dissenters called for more deference to the findings of the two lower courts, and suggested that counsel in a pending trial had special responsibilities. The case, far from supporting the discipline imposed here, is at war with the present result.

The principal opinion struggles to find "recklessness," saying:

It is not clear, however, whether the "with knowledge or in reckless dis-

regard" standard used in defamation cases must be strictly applied in disciplinary proceedings.

*Garrison* and *St. Amant v. Thompson*, 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968), provide the answer. Lawyers may not be disadvantaged in their political speech except for compelling reasons.

Respondent's "recklessness" is apparently found in his failure to think things through or to study the case law. But recklessness in First Amendment law is a term of art, not to be casually attributed. In *Garrison*, the Court said, "it is essential that the First Amendment protect some erroneous publications." *Garrison v. Louisiana*, 379 U.S. at 74, 85 S.Ct. at 216. "Moreover, even where the utterance is false, the great principles of the Constitution which secure freedom of expression in this area preclude attaching adverse consequences to any except the knowing or reckless falsehood." *Id.* at 73, 85 S.Ct. at 215. The United States Supreme Court has explained that in cases concerning public figures and matters of public interest

reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained *serious doubts as to the truth of his publication.* Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice. (Emphasis supplied).

*St. Amant v. Thompson*, 390 U.S. at 731, 88 S.Ct. at 1325. That case also teaches the negligent failure to investigate does not establish recklessness. *St. Amant v. Thompson*, 390 U.S. at 733, 88 S.Ct. at 1326. *See also Cervantes v. Time, Inc.*, 330 F.Supp. 936, 938 (E.D.Mo.1971). The principal opinion fails to demonstrate that the respondent's utterances meet the standards of *St. Amant* and *Garrison*.[7]

Our own jurisprudence also teaches that recklessness is not lightly to be found.

---

**7.** I find astounding the intimation that the respondent should have made any kind of report to the Committee on Retirement, Removal and Discipline, when he stated emphatically that he did not assert or imply any suggestion of judicial misconduct.

*Glover v. Herald Co.*, 549 S.W.2d 858 (Mo. banc 1977), Seiler, C.J. There a St. Louis alderwoman stated at a meeting of the Board that she had had two abortions. Her name was correctly telephoned to the city desk by a reporter, but the rewrite editor substituted the name of another alderwoman while "working on a deadline." This Court set aside a verdict for the plaintiff, holding that the jury could not properly find reckless conduct under the evidence in the case and because there was no "high degree of awareness on [the editor's] part of probable falsity in what he wrote." *Id.* at 861.

Today this Court fails to heed the federal decisions defining recklessness. In assigning an unwarranted construction to Rule 8.2, the Court commits the classic First Amendment sin of overbreadth. If lawyers are subjected to the whims of particular tribunals, and are unable to determine the limits of their freedom of expression, their protected expressions will be seriously impeded.[8]

The *New York Times* principle and the cases applying it represent good law and good policy. Our bill of rights embodies the same values as does the First Amendment. We should not strive for minuscule distinctions in order to discipline a lawyer for speech. The *New York Times–Garrison* principles amply protect the public from defamatory statements by lawyers about judges. We should proceed in the tradition of free speech, which our courts have honored so long.

### 3. *The Actions of the Advisory Committee*

There is another reason why the proceeding should be terminated without discipline.

The Advisory Committee sought to bring the matter to an end after the formal hearing by tendering the respondent a written admonition pursuant to Rule 5.13. This tender necessarily indicated that the Committee was of the opinion that his conduct did not require either suspension or disbarment. Had it concluded that a temporary or permanent separation from the practice was required in the public interest, its offer of a mere admonition would be manifestly irresponsible.

The respondent refused the admonition in a courteous letter stating that "I . . . feel strongly that my conduct was not only professional, but appropriate." This he had the perfect right to do.[9] An admonition is not a trivial matter. It could be used in future disciplinary proceedings.[10] The respondent might believe that, if he accepted the admonition, he would be considered a "prior offender" whose every utterance respecting the judicial system and its personnel would be scrutinized by the bar disciplinary authorities. He should not, at the very least, be subjected to additional sanctions for refusing it. The most that he should risk is a formalization of the charges, with no sanction in excess of a public reprimand. An admonition is not an invitation to plea bargain, designed in part to cut down on the burdens of the prosecutor. Its sole purpose is advisory and remedial, in a case in which the respondent's fitness to practice is not questioned.

After the admonition was refused the Committee filed an information praying that the respondent "be disbarred, that his right and license to practice law be canceled and terminated, and that his name be

**8.** *See Board of Airport Commissioners of Los Angeles v. Jews for Jesus, Inc.*, 482 U.S. 569, 107 S.Ct. 2568, 96 L.Ed.2d 500 (1987) (invalidating rule which proscribed all First Amendment activities in airport terminal); *Marsh v. Alabama*, 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946) (trespass statute held not enforceable against distribution of religious literature on streets of company town).

Traditionally, it is the function of courts to define the constitutional and permissible contours of a rule, regulation or statute. Today,

however, it is the judiciary, painting with a broad brush, that intrudes on the narrow boundary of a rule already defined through years of Supreme Court jurisprudence.

**9.** It is of interest that the admonition in this case was not designed to be strictly private, as is ordinarily the case, but was conditioned on Judge Karohl's being advised about it.

**10.** *In re Kopf*, 767 S.W.2d 20, 22 (Mo. banc 1989).

stricken from the roll of attorneys in this state." The message was loud and clear. If a lawyer doesn't say "uncle" when the Advisory Committee offers an admonition, then they'll throw the book. Many accused lawyers would accept admonitions they consider unwarranted rather than subjecting themselves to public prayers for disbarment.

Next, at the hearing before the master, the informants made a highly publicized recommendation for a suspension of three years. This recommendation was confirmed in their brief, and, in oral argument, they asked for a "substantial" suspension. The Committee's recommendation can only be regarded as further attempt at punishment for rejecting the admonition.[11]

But this is not all. The informants argued in their brief, and also before us, that the Court could consider additional charges of rule violation, of which the respondent had no notice, in support of the enhanced sanction they sought. It was then asserted that the respondent's criticism of the original Bullock jury after the verdict violated Rules 3.6(a) and 3.8(e).[12] Neither of these rules was mentioned in the information. This approach is not only in conflict with our rules; it violates the elementary principles of due process of law. The principal opinion properly states that these additional charges are not being considered, but we should go further. We should tell the Advisory Committee in no uncertain terms that an information in a disciplinary action must set out all of the rule violations the Committee relies on in support of the discipline it seeks. If additional charges are sought an amended information should be tendered. This attempt to proffer additional charges is a further example of chilling tactics.

The tactics of the Committee are appropriate for comment in this case, in which the respondent is being charged for what

he said. The principal opinion suggests that the relationship between the First Amendment and lawyer disciplinary proceedings has not been well defined in the case law. If this is so, we should respect those who invoke the First Amendment when they are drawn into court because of what they say. We should not forget the blood that has been shed in defense of free speech. Some defenders may turn out to be wrong and may ultimately suffer sanctions, but they should not be placed in additional jeopardy for seeking judicial determination of their rights as they view them. The Advisory Committee's conduct has a strong potential for chilling freedom of expression. The Court should abate the proceedings, drawing an analogy from findings of prosecutorial misconduct in criminal cases.

There is a further chilling in the intimation in the master's report and in the principal opinion that the respondent should have made some sort of apology on the record, after the filing of the information. The opinion refers to his "private" statement of confidence in the judge's integrity and his apology at the formal hearing, but then asserts that he has "continually and steadfastly refused to deviate from his original position." I do not understand this at all. After the formal hearing his license was in jeopardy. He should be entitled to make his defense, and public statements outside of the proceedings should surely be discouraged. He explained that he meant no criticism of the judge's integrity. Is the Court suggesting that he should have announced a change in his view of the court of appeals opinion? We have no right to browbeat him in this manner.

The opinion presents a further problem by its repeated suggestions that the respondent has not laid an adequate research foundation for his criticisms of the Karohl opinion.[13] It faults him for pointing only to

---

**11.** Based on our cases, a recommendation either of disbarment or substantial suspension for this single offense is patently ridiculous, whether or not a reprimand was previously tendered.

**12.** I am rather shocked by the intimation that a prosecutor might be disciplined because he criti-

cized a jury which returned a full or partial acquittal.

**13.** *See, e.g., St. Amant v. Thompson,* 390 U.S. at 733, 88 S.Ct. at 1326 (negligent failure to investigate does not constitute recklessness).

"the long and tortuous history of armed criminal action in Missouri," and for his not "suggesting precedent or logic that he believes would constitute an 'honest' opinion...." It says that he "failed to investigate to determine whether Judge Karohl has participated in any cases involving the armed criminal action rule," overlooking his participation in the issuance of the preliminary rule. These comments belie the finding of false statement of fact.

### Conclusion

Make no mistake about it. The principal opinion chills lawyers' speech about judicial decisions. It invites the speaker to weigh every word. It invites political opponents to scan statements for the least suspicion of a false statement of fact and to publicize the filing of charges for any criticism of a court or a judge, or, for that matter, of any of the other persons protected by Rule 8.2(a), which applies to statements about adjudicatory officers, public legal officers and candidates for election or appointment to judicial or legal office, as well as to judges. The disadvantages of allowing these kinds of complaints far outweigh the advantages. *See NAACP v. Button,* 371 U.S. at 433, 83 S.Ct. at 338, warning of the danger inherent in censoring criticism of public issues, as follows:

> A rule compelling the critic of official conduct to guarantee the truth of all his factual assertions leads to ... 'self-censorship.' ... Under such a rule, would-be critics of official conduct may be deterred from voicing their criticism, even though it is believed to be true and even though it is in fact true, because of doubt whether it can be proved in court or fear of the expense of having to do so.

The respondent adduced quite a few statements of other lawyers and judges containing comments about judicial decisions similar to the statements challenged here. The principal opinion testily replies that "It is not respondent's function, but the appropriate disciplinary committees', to initiate enforcement of the Professional Rules." This language portends further disciplinary proceedings against lawyers and judges who express themselves too freely. Many will conclude that it is wise to keep quiet. Lawyers, who have contributed so much to public discussion in the past, should not be severely disadvantaged as compared to other members of the public.

On the whole record, Westfall should be fully discharged of the information.