Delores GLOVER, Respondent,

v.

The HERALD COMPANY d/b/a Globe-Democrat Publishing Company, Appellant.

No. 59804.

Supreme Court of Missouri, En Banc.

April 11, 1977.

Rehearing Denied May 10, 1977.

Lon Hocker, Clayton, for appellant.

George D. Chopin, St. Louis, for respondent.

John T. Martin, Kansas City, for amici Kansas City Star Co., and others.

Robert Hoemeke, Evans, Hoemeke & Casey, St. Louis, for amici Pulitizer Pub. Co.

SEILER, Chief Judge.

This is a libel action in which respondent Glover was awarded $4,000 actual and $3,000 punitive damages from appellant, The Herald Company, which publishes the St. Louis Globe-Democrat, a general circulation newspaper, which will hereinafter be referred to as the Globe-Democrat. The Globe-Democrat appealed the judgment to the court of appeals, St. Louis district, where Division Four, by a divided court, affirmed the judgment and then sustained appellant's motion to transfer, Rule 83.02. We will determine this case as on original appeal. Mo.Const. Art. V, § 10; Rule 83.09. We reverse.

Mrs. Glover is the duly elected alderwoman representing the third ward of the city of St. Louis. In this capacity she attended a meeting of the Board of Aldermen on July 6, 1973, at which members of the board debated the merits of a bill to regulate the equipment required at clinics performing abortions. Mrs. Glover, although an opponent of abortion, did not speak to the issue at this meeting. During the course of this debate, alderwoman Lerel Stewart voiced her objection to the proposed ordinance, declaring that on the basis of personal knowledge, having had two abortions, she believed no such equipment was required. Alderwoman Stewart's remarks caused something of a furor. Mrs. Glover, upset by the remarks of alderwoman Stewart's personal experience, left the room momentarily to regain her composure. After the meeting it became clear that alderwoman Stewart had misspoken herself. Mrs. Glover overheard a conversation between alderwoman Stewart and Globe-Democrat reporter Marsha Canfield to the effect that alderwoman Stewart although stating in public debate that she had had two abortions, actually meant to say she had had two involuntary miscarriages. Reporter Canfield then telephoned the Globe-Democrat with her story of the aldermanic de-

bate and the votes cast by the individual members of the Board of Aldermen on the bill. Although Canfield accurately related the course of events and properly attributed alderwoman Stewart's remarks and the later correction to Mrs. Stewart, the Globe-Democrat rewrite man, Andrew Wilson, who received reporter Canfield's telephone call, confused the names of the participants in the news story and incorrectly attributed alderwoman Stewart's remarks to Mrs. Glover. Wilson testified:

"I was working on a deadline, and I had a bundle of names in the story, and we talked about it, and how some of the people voted, and it was just a personal mistake on my part. I was given the correct information by Marsha. On my typewritten notes, I had Mrs. Glover's name a couple of lines above Mrs. Stewart's name, and in reading over the notes, I didn't notice Mrs. Stewart's name and saw Mrs. Glover's name, and I attributed the wrong remark to the wrong person."

The city editor of the Globe-Democrat, who had no reason to question the accuracy of the report as rewritten by Wilson, passed the story for publication after having read it. The story appeared in the next day's edition on Saturday as written by rewrite man Wilson and attributed the remarks of alderwoman Stewart concerning abortion to Mrs. Glover. Upon reading the article, Mrs. Glover became upset to such a degree that she required sedation. A retraction was immediately demanded of the Globe-Democrat, which responded by publishing a retraction in its editions on its next publishing day, Monday. Mrs. Glover testified that as a further consequence of the Globe-Democrat story, she received numerous anonymous obscene telephone calls for a period of two weeks following publication of the story and two letters detailing the horrors of abortion.

We hold that notwithstanding the obvious and regrettable upset suffered by Mrs. Glover, as a public official she has failed as a matter of law to demonstrate that the Globe-Democrat published its story with the actual malice required to overcome the qualified constitutional privilege recognized in *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), and therefore, the judgment and verdict in the circuit court are reversed.

The modern source for the law of defamation of public officials is *New York Times Co. v. Sullivan*. The alleged libel in that case was contained in an advertisement placed in the New York Times to solicit funds to defend the Rev. Dr. Martin Luther King, Jr., against charges of perjury. The advertisement incorrectly portrayed the reaction of Montgomery, Alabama, police to a demonstration held at an Alabama state college campus. The New York Times made no effort to substantiate the accuracy of the advertisement although the correct information was available from the Times' news files. The Montgomery City commissioner with authority over the police sued to redress this alleged libel.

The Supreme Court recognized the sensitive nature of the question presented and the inevitable stress generated by a contest between the law of libel and the First Amendment's explicitly guaranteed protection of free speech. Moreover, the court recognized the crucial role the press plays when reporting the affairs of government and public officials by deciding the *New York Times* case

"against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials."

*New York Times Co. v. Sullivan*, supra at 270, 84 S.Ct. at 721.

■ To this end, the Supreme Court articulated a constitutional standard prohibiting a public official from recovering for

"a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice' —that is, with knowledge that it was

false or with reckless disregard of whether it was false or not."

Id. at 279–80, 84 S.Ct. at 726.[1]

 Respondent misapprehends the quality of knowledge required by this standard to overcome the constitutional protection. As a public official, which there can be no doubt she was, respondent's case is bottomed upon the presumption that Wilson knew that the story as published was false because he had originally received the correct information from reporter Canfield, and therefore, respondent maintains she has satisfied the New York Times standard by establishing actual malice. Although the error in respondent's interpretation of actual malice is demonstrable by reference to *New York Times Co. v. Sullivan* alone, this conclusion is further compelled by more recent United States Supreme Court cases that refine the standard articulated in *New York Times Co.*

 By the language of *New York Times Co.*, (1) actual malice is to be measured at the time of publication, (2) the state of mind necessary to establish actual malice requires that this knowledge "be brought home to the persons . . . having responsibility for the publication", and (3) negligence is "constitutionally insufficient to show the recklessness that is required for a finding of actual malice." *New York Times Co.*, supra at 286–88, 84 S.Ct. at 730.

 In *Garrison v. Louisiana*, 379 U.S. 64, 74–75, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964), the Supreme Court explained that the qualified privilege articulated in *New York Times Co.* could grant a public official a

> "civil remedy only if he establishes that the utterance was false and that it was made with knowledge of its falsity or in reckless disregard of whether it was false or true. . . . And since '. . . erroneous statement is inevitable in free

debate, and . . . it must be protected if the freedoms of expression are to have the "breathing space" that they "need . . . to survive" . . .,' 376 U.S. at 271–272, 84 S.Ct. at 721, only those false statements made with the high degree of awareness of their probable falsity demanded by *New York Times* may be the subject of either civil or criminal sanctions. For speech concerning public affairs is more than self-expression; it is the essence of self-government.

> ". . . .

> "Although honest utterance, even if inaccurate, may further the fruitful exercise of the right of free speech, it does not follow that the lie, knowingly and deliberately published about a public official, should enjoy a like immunity. . . . Hence the knowingly false statement and the false statement made with reckless disregard of the truth, do not enjoy constitutional protection."

The Supreme Court took the further opportunity to disavow any desire to base *New York Times Co.* upon a negligence standard, id. at 79, 85 S.Ct. 209. Thus it becomes increasingly clear that Wilson did not have the requisite intent. Although initially he was presented the facts, Andrew Wilson was unaware of the falsity of the story. The most that can be said is that he was negligent, regrettably, in preparing the story of the aldermanic debates. There is no evidence of a high degree of awareness on his part of probable falsity in what he wrote. Consequently, here as in *New York Times,* the evidence against the Globe-Democrat "supports at most a finding of negligence in failing to discover the misstatements, and is constitutionally insufficient to show the recklessness that is required for a finding of actual malice." 376 U.S. at 288, 84 S.Ct. at 730.

In *Beckley Newspapers Corp. v. Hanks*, 389 U.S. 81, 84, 88 S.Ct. 197, 199, 19 L.Ed.2d

---

1. It has come to be recognized that a public official must establish this proof with convincing clarity. *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 275–76, 91 S.Ct. 621, 28 L.Ed.2d 35

(1971); *New York Times Co. v. Sullivan*, 376 U.S. 254, 285–86, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).

248 (1967) the court reaffirmed the *New York Times Co.* standard requiring a "high degree of awareness of . . . probable falsity." In *St. Amant v. Thompson,* 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968), the court stated that "[t]here must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice." In 1971, three cases reiterated the *New York Times Co.* standard requiring clear and convincing proof, *Monitor Patriot Co. v. Roy,* 401 U.S. 265, 275–76, 91 S.Ct. 621, 28 L.Ed.2d 35, of publication of knowing falsehood, *Ocala Star-Banner Co. v. Damron,* 401 U.S. 295, 300, 91 S.Ct. 628, 28 L.Ed.2d 57, not just negligent error of fact, *Time, Inc. v. Pape,* 401 U.S. 279, 291, 91 S.Ct. 633, 28 L.Ed.2d 45.

The *Ocala* case is of particular interest. In that case, a newspaper published a story that the mayor who was running for a different elective office, had been charged with perjury. Actually, the story was false about the mayor but substantially correct about his brother. Apparently the reporter telephoning the story into the area editor had correctly identified the brother, but the editor, never having heard of the brother, inadvertently substituted the name of the mayor. The Supreme Court reversed the judgment which had been awarded to the mayor, because recovery had been allowed without a finding that the article was published with reckless disregard of its truth or falsity. *Ocala Star-Banner Co. v. Damron,* supra, 401 U.S. at 300, 91 S.Ct. at 628.

Last, in *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 334–35 n. 6, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), the Supreme Court once again embraced *New York Times Co.* and *St. Amant v. Thompson,* among others.

"In *New York Times* the Court held that under the circumstances the newspaper's failure to check the accuracy of the advertisement against news stories in its own files did not establish reckless disregard for the truth. . . . In *St. Amant v. Thompson* . . . the Court equated reckless disregard of the truth with subjective awareness of probable falsity: 'There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication.' "

In view of the foregoing cases, there can be no doubt that appellant did not possess the requisite state of mind at the time of publication so as to enable respondent to overcome the constitutional limitations. The judgment is reversed.

MORGAN, BARDGETT, HENLEY, FINCH and DONNELLY, JJ., and SHANGLER, Special Judge, concur.

RENDLEN, J., not sitting.