971 P.2d 1089

Brian R. JENKINS, Plaintiff–Appellant,

v.

LIBERTY NEWSPAPERS LIMITED PARTNERSHIP, dba Honolulu Star Bulletin, Phillips Media Services, Inc., and Rick Daysog, Defendants–Appellees

No. 21114

Supreme Court of Hawai'i.

Jan. 20, 1999.

John S. Edmunds, Ronald J. Verga, and Wesley D. Shimazu (of Edmunds Maki Verga & Thorn), on the briefs, Honolulu, for plaintiff-appellant Brian R. Jenkins.

Margaret Jenkins Leong, David J. Dezzani, and Kathleen Kelly (of Goodsill, Anderson, Quinn & Stifel), on the briefs, Honolulu, for defendants-appellees Liberty Newspapers Limited Partnership, dba Honolulu Star Bulletin, Phillips Media Services, Inc. and Rick Daysog.

MOON, C.J., KLEIN, LEVINSON, NAKAYAMA, AND RAMIL, JJ.

Opinion of the Court by LEVINSON, J.

This case arises from the publication of a news article in the Honolulu Star–Bulletin, in which the plaintiff-appellant Brian Jenkins (hereinafter, "Brian" or "Jenkins") was mistakenly identified as the target of an investigation by the State of Hawai‘i Insurance Commissioner. Jenkins appeals from (1) the

circuit court's judgment as to all parties and (2) its orders granting the motions of the defendants-appellees Liberty Newspapers Limited Partnership, dba Honolulu Star–Bulletin, Phillips Media Services, Inc., and Rick Daysog (collectively, Liberty News) (a) for summary judgment on Jenkins's claim of negligence (Count I) and (b) for summary judgment on Jenkins's claims for actual malice and punitive damages (Counts II and III). On appeal, Jenkins argues that the circuit court erred: (1) in granting summary judgment as to Counts II and III because there were genuine issues of material fact as to whether Liberty News (a) had a high degree of awareness of the falsity of its published statements, (b) exhibited "reckless disregard" for the truth of its published statements, and (c) demonstrated "actual malice" by failing to notify the Associated Press of its error or publish a retraction in time to prevent republication by other newspapers that received the story from the wire service; (2) in granting summary judgment as to Count I because there were genuine issues of material fact as to whether Jenkins had suffered "actual injury" as a result of the false statement published by Liberty News; and (3) in entering judgment in favor of Liberty News, inasmuch as the underlying orders granting the motions for summary judgment were erroneous. We affirm the judgment and orders appealed from.

## I. BACKGROUND

On May 24, 1995, the Hawai‘i State Insurance Commissioner, Wayne Metcalf, filed an Ex Parte Petition for Seizure Order (the petition) against J.D. Jenkins & Company, Inc. (J.D. Jenkins), a Maui-based insurance agency. The petition and its supporting documents alleged a deficit in J.D. Jenkins' customer accounts and financial improprieties by the company's principals. It expressly requested that "the court order all court records pertaining to, or a part of, these proceedings be kept confidential as, and to the extent, provided by [Hawai‘i Revised Statutes (HRS)] § 431:15–203 [(1993)]."[1]

1. HRS § 431:15–203 provides:
   **Confidentiality of hearings.** In all proceedings and judicial reviews thereof under section 431:15–201 and section 432:15–202, all records of the insurer, other documents, and all files, court records, and papers of the insurance divi-

Nevertheless, through inadvertence, the petition was placed in the public access bin at the first circuit court.

Daysog, a reporter for the Honolulu Star–Bulletin, obtained the petition from the public access bin, and, after soliciting comments from a number of persons identified in the petition, including *inter alia,* the Department of the Attorney General, Metcalf, and James Stone, J.D. Jenkins' attorney, wrote the following article, which was published in the May 26, 1995 edition of the Star–Bulletin:

The state has received court approval to seize a Maui insurance agency which the state said is insolvent and may have misappropriated customers' premiums.

Circuit Judge Herbert Shimabukuro Wednesday approved a confidential petition by state Insurance Commissioner Wayne Metcalf to take over J.D. Jenkins & Co., after Metcalf argued that the insurance agency's customer accounts had a deficit of more than $500,000.

"There is reasonable cause to believe that there had been embezzlement from the respondent insurer or other illegal conduct in, by or with respect to the insurer that if established would endanger assets in an amount threatening the solvency of the insurer," Metcalf said in court documents.

Jim Stone, attorney for Jenkins & Co., yesterday denied any wrongdoing by his client, saying the insurance agency has worked closely with the state and independent auditor, Coopers & Lybrand L.L.P., to resolve any shortfall.

Stone said that the company's officers— Margaret Jenkins, president, and Bill Jenkins, vice president—spent more than $200,000 of their own money to help reduce the shortfall from $740,562 in December to about $395,000. He added the Jenkins have applied for a loan to cover the balance of the deficit, which is collateralized by Margaret Jenkins' Maui home. Stone

said the home has been appraised at $1 million.

"To suggest that there has been any malicious wrongdoing is clearly out of the picture," Stone said. "There is no jeopardy to our clients."

Metcalf declined comment on the matter yesterday, saying the court ordered the proceedings confidential. But in affidavits and letters obtained by the Star–Bulletin, the insurance commissioner and his chief examiner raised serious questions about the company's management:

- According to Metcalf, more than $370,000 of customers' money was given to Margaret and *Brian Jenkins* as payment beyond their ordinary salaries, commissions and bonuses.
- Metcalf said there was a risk that the Jenkins may make further questionable withdrawals or may fail to deposit trust funds.
- Timothy Bogan, Chief examiner of the insurance division, noted that clients' premiums were mixed with agency funds and were not stored in a separate trust account as required by state law.

Stone, meanwhile, said the dispute is partly due to new accounting rules affecting insurance agencies. He said the state recently began to require insurance agencies to separate customers' premiums from the agencies' funds but that many companies have failed to do so.

The insurance division recently surveyed local insurance agencies and found that up to 17 firms were not in compliance with the new law, Stone said.

"A number of agencies have the same misunderstanding," Stone said. "Our client has done everything possible to cooperate."

Based in Wailuku, Jenkins & Co. is an insurance general agency which sells auto and home insurance, Stone said.

sion of the department of commerce and consumer affairs, so far as they pertain to or are part of the record of the proceedings, shall be and remain confidential except as is necessary to obtain compliance therewith, unless the circuit court of the first judicial circuit of this State,

after hearing arguments from the parties in chambers, orders otherwise, or unless the insurer requests that the matter be made public. Until the court order, all papers filed with the court shall be confidential.

The state insurance division began its initial probe of the company in November 1994. The examination found a "long-standing and steadily increasing deficit" that grew to $654,924.47, a state deputy attorney general said in a memo supporting the seizure. The shortfall eventually grew to $740,562 before the Jenkins officers paid $200,000 to the client fund.

Under the seizure order, which expires July 24, the insurance commissioner can take possession of financial records and its day-to-day duties in order to rehabilitate the company.

(Emphasis added.)

The petition, in fact, made no allegations of improprieties by Brian, a Maui attorney, who was the son of Margaret Jenkins and the brother of Bill Jenkins, but who had never served as an officer or employee of J.D. Jenkins and whose only connection with the agency was that he had represented it as its attorney in connection with certain matters. Brian, however, was among those contacted by Daysog during his investigation of the story. He had asked Daysog to fax him a copy of the article after its publication. Upon reading the story, Brian was surprised to find himself mentioned in Daysog's story. He immediately called the Star–Bulletin and notified them of the misidentification. He was told by personnel of the newspaper that they "would look into it and get back to [him]."

Daysog later signed a declaration explaining how the error arose. Because he was unsure of the correct spelling of the plural form of the word "Jenkins," Daysog decided to avoid the problem by referring to the Jenkins by their first names, Bill and Margaret Jenkins. However, instead of reviewing the petition for the correct first names, he read a letter, which was attached to the petition as an exhibit, written on behalf of the agency to the State Insurance Commissioner and signed by Brian Jenkins as the agency's attorney. Accordingly, Daysog mistakenly substituted the name of Brian Jenkins for that of Bill Jenkins in the article.

Upon discovery of the error, the Star–Bulletin published a retraction on Monday, May 29, 1995. However, before the retraction appeared, the story was picked up by the Associated Press and printed in other newspapers, including The Maui News.

On July 27, 1995, Brian filed a complaint alleging negligence (Count I), actual malice (Count II), and a claim for punitive damages (Count III). On August 8, 1995, he filed a first amended complaint. On June 26, 1997, Liberty News filed a motion for summary judgment on Jenkins's claims in Counts II and III, arguing that (1) in the defamation context, "actual malice" required either subjective knowledge that the statement made was untrue or reckless disregard of its truth or falsity, (2) the uncontested facts showed that the false statement at issue was the result of an inadvertent error, which was insufficient to prove "actual malice," (3) while the petition was intended to be kept confidential by court personnel, Daysog obtained it lawfully, and, therefore, his knowledge that the court had not intended to release the information contained in it was not relevant to the question of whether he acted with "actual malice," and (4) Liberty News was entitled to summary judgment on Jenkins's claim for punitive damages, because, as a matter of law, punitive damages could not be awarded absent a showing of "actual malice."

Jenkins argued in opposition to the motion for summary judgment that Liberty News (1) had evidenced "actual malice" by its failure to correct the erroneous story quickly enough to prevent republication through the wire service, (2) was liable for The Maui News' republication of the story because republication was reasonably foreseeable, and (3) had relied improperly upon the first amendment's protection of publication of lawfully obtained—but unintentionally released—material, inasmuch as (a) the statement at issue was not truthful, (b) the statute requiring the information to be kept confidential was aimed at the general public, rather than solely at the news media, and (c) Liberty News had possessed actual knowledge of the confidential nature of the petition.

On July 21, 1997, Liberty News filed a second motion for summary judgment on Jenkins's claim for negligence set forth in

Count I, arguing that, inasmuch as Jenkins had produced no evidence of actual injury, but, rather, had alleged only "his 'feeling' that the alleged defamation caused him some immeasurable loss of new clients," he had failed to establish a prime facie case of negligence. Jenkins opposed the motion, arguing that the false statement made by Liberty News was *per se* libelous, inasmuch as it (1) attributed unlawful activity to Jenkins, (2) injured him in his profession, and (3) exposed him to ridicule in the community.

On August 18, 1997, the first circuit court entered an order granting Liberty News's motion for summary judgment as to Counts II and III. On October 8, 1997, the court entered an order granting the motion for summary judgment as to Count I. On October 22, 1997, judgment was entered in favor of Liberty News and against Jenkins.

This timely appeal followed.

## II. *STANDARD OF REVIEW*

In determining whether summary judgment was appropriate in the present matter, in which defamatory falsehood was alleged, the circuit court was required to decide whether " 'there [was] a genuine issue of material fact from which a reasonable jury acting reasonably could find actual malice with convincing clarity[.]' " *Mehau v. Gannett Pacific Corp.*, 66 Haw. 133, 145, 658 P.2d 312, 321 (1983) (quoting *Nader v. de Toledano*, 408 A.2d 31, 50 (D.C.1979), *cert. denied*, 444 U.S. 1078, 100 S.Ct. 1028, 62 L.Ed.2d 761 (1980)). " 'Other than the higher standard of proof which the plaintiff must carry as a matter of law, the normal summary judgment procedure should be followed in "actual malice" defamation actions.' " *Id.* (quoting *Rodriguez v. Nishiki*, 65 Haw. 430, 439, 653 P.2d 1145, 1151 (1982)).

We review [a] circuit court's award of summary judgment *de novo* under the same standard applied by the circuit court. *Amfac, Inc. v. Waikiki Beachcomber Inv. Co.*, 74 Haw. 85, 104, 839 P.2d 10, 22, *reconsideration denied*, 74 Haw. 650, 843 P.2d 144 (1992) (citation omitted). As we have often articulated:

[s]ummary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

*Id.* (citations and internal quotation marks omitted); *see* Hawai'i Rules of Civil Procedure (HRCP) Rule 56(c) (1990). "A fact is material if proof of that fact would have the effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties." *Hulsman v. Hemmeter Dev. Corp.*, 65 Haw. 58, 61, 647 P.2d 713, 716 (1982) (citations omitted). *Konno v. County of Hawai'i*, 85 Hawai'i 61, 70, 937 P.2d 397, 406 (1997) (quoting *Dunlea v. Dappen*, 83 Hawai'i 28, 36, 924 P.2d 196, 204 (1996)) (brackets in original). "The evidence must be viewed in the light most favorable to the non-moving party." *State ex rel. Bronster v. Yoshina*, 84 Hawai'i 179, 186, 932 P.2d 316, 323 (1997) (citing *Maguire v. Hilton Hotels Corp.*, 79 Hawai'i 110, 112, 899 P.2d 393, 395 (1995)). In other words, "we must view all of the evidence and the inferences drawn therefrom in the light most favorable to [the party opposing the motion]." *Maguire*, 79 Hawai'i at 112, 899 P.2d at 395 (citation omitted).

*State Farm Mut. Auto Ins. Co. v. Murata*, 88 Hawai'i 284, 287–88, 965 P.2d 1284, 1287–88 (1998) (quoting *Estate of Doe v. Paul Revere Ins. Group*, 86 Hawai'i 262, 269–70, 948 P.2d 1103, 1110–11 (1997)) (brackets in original).

## III. *DISCUSSION*

A. *The Circuit Court Correctly Ruled That Jenkins Had Failed To Show With Convincing Clarity That Liberty News Had Published The Story Containing The Misidentification With Actual Malice.*

Jenkins premises his assertion that the record reveals sufficient evidence to have allowed a reasonable juror to find that Liberty News had acted with "actual malice" on three theories: (1) the publication of information from documents that Liberty News

knew were statutorily mandated to have been kept confidential by the court; (2) Liberty News's failure to correct the error quickly enough to prevent republication; and (3) Liberty News's reckless disregard of the truth or falsity of the statement, as evidenced by the use of names derived from a letter attached to the petition, rather than from the petition itself, in order to identify the principals of J.D. Jenkins. None of his arguments are persuasive.

1. *Publication of information from lawfully acquired government documents may not be penalized merely by virtue of the fact that the information was intended to be confidential.*

In *The Florida Star v. B.J.F.*, 491 U.S. 524, 109 S.Ct. 2603, 105 L.Ed.2d 443 (1989), the United States Supreme Court reversed a civil judgment, which had been entered against a newspaper that had published the name of a rape victim in violation of "Florida Stat. § 794.03 (1987)[, which made] it unlawful to 'print, publish, or broadcast … in any instrument of mass communication' the name of the victim of a sexual offense," on the ground that such an imposition of civil liability violated the protections afforded by the first amendment to the United States Constitution. *Id.* at 526, 109 S.Ct. 2603. The Florida Star had obtained the victim's name from a police report that had been erroneously placed in the police department's pressroom. *Id.* at 527–28, 109 S.Ct. 2603. B.J.F. subsequently sued both the police department and the newspaper, alleging negligent violation of § 794.03. *Id.* at 528, 109 S.Ct. 2603.

> The Florida Star moved to dismiss, claiming, *inter alia*, that imposing civil sanctions on the newspaper pursuant to § 794.03 violated the First Amendment. The trial judge rejected the motion.
>
> . . . .
>
> … At the close of the newspaper's defense, the judge granted B.J.F.'s motion for a directed verdict on the issue of negligence, finding the newspaper *per se* negligent based upon its violation of § 794.03.

*Id.* at 528–29, 109 S.Ct. 2603. The *Florida Star* Court reasoned:

In our view, this case is appropriately analyzed with reference to … a limited First Amendment principle. It is the one … which we articulated in [*Smith v.] Daily Mail [Publishing Co.*, 443 U.S. 97, 99 S.Ct. 2667, 61 L.Ed.2d 399 (1979),] in our synthesis of prior cases involving attempts to punish truthful publication: "[I]f a newspaper lawfully obtains truthful information about a matter of public significance then state officials may not constitutionally punish publication of the information, absent a need to further a state interest of the highest order." 443 U.S., at 103 [99 S.Ct. 2667]. According the press the ample protection provided by that principle is supported by at least three separate considerations, in addition to, of course, the overarching " 'public interest, secured by the Constitution, in the dissemination of truth.' " *Cox Broadcasting [Corp. v. Cohn*, 420 U.S. 469,] 491 [95 S.Ct. 1029, 43 L.Ed.2d 328 (1975) ], quoting *Garrison [v. Louisiana*, 379 U.S. 64,] 73 [85 S.Ct. 209, 13 L.Ed.2d 125 (1964) ] (footnote omitted). The cases on which the *Daily Mail* synthesis relied demonstrate these considerations.

First, because the *Daily Mail* formulation only protects the publication of information which a newspaper has "lawfully obtain[ed]," 443 U.S., at 103 [99 S.Ct. 2667], the government retains ample means of safeguarding significant interests upon which publication may impinge, including protecting a rape victim's anonymity. To the extent sensitive information rests in private hands, the government may[,] under some circumstances[,] forbid its nonconsensual acquisition, thereby bringing outside of the *Daily Mail* principle the publication of any information so acquired. To the extent sensitive information is in the government's custody, it has even greater power to forestall or mitigate the injury caused by its release. The government may classify certain information, establish and enforce procedures ensuring its redacted release, and extend a damage remedy against the government or its officials where the government's mishandling of sensitive information leads to its dissem-

ination. Where information is entrusted to the government, a less drastic means than punishing truthful publication almost always exists for guarding against the dissemination of private facts. See, *e.g.*, *Landmark Communications[, Inc. v. Virginia*, 435 U.S. 829,] 845 [98 S.Ct. 1535, 56 L.Ed.2d 1 (1978) ] ("[M]uch of the risk [of disclosure of information regarding judicial disciplinary proceedings] can be eliminated through careful internal procedures to protect the confidentiality of Commission proceedings"); *Oklahoma Publishing[ Co. v. Oklahoma District Court*, 430 U.S. 308,] 311 [97 S.Ct. 1045, 51 L.Ed.2d 355 (1977) ] (noting trial judge's failure to avail himself of the opportunity, provided by a state statute, to close juvenile hearing to the public, including members of the press, who later broadcast juvenile defendant's name); *Cox Broadcasting, supra*, at 496, 95 S.Ct. 1029 ("If there are privacy interests to be protected in judicial proceedings, the States must respond by means which avoid public documentation or other exposure of private information[.]").

A second consideration undergirding the *Daily Mail* principle is the fact that punishing the press for its dissemination of information which is already publicly available is relatively unlikely to advance the interest in the service of which the State seeks to act. It is not, of course, always the case that information lawfully acquired by the press is known, or accessible, to others. But where the government has made certain information publicly available, it is highly anomalous to sanction persons other than the source of its release. We noted this anomaly in *Cox Broadcasting:* "By placing the information in the public domain on official court records, the State must be presumed to have concluded that the public interest was thereby being served." 420 U.S., at 495 [95 S.Ct. 1029]. The *Daily Mail* formulation reflects the fact that it is a limited set of cases indeed where, despite the accessibility of the public to certain information, a meaningful public interest is served by restricting its further release by other entities, like the press. As *Daily Mail* observed in summary of *Oklahoma Publish-*

*ing*, "once the truthful information was 'publicly revealed' or 'in the public domain' the court could not constitutionally restrain its dissemination." 443 U.S., at 103 [99 S.Ct. 2667].

A third and final consideration is the "timidity and self-censorship" which may result from allowing the media to be punished for publishing certain truthful information. *Cox Broadcasting, supra*, at 496 [95 S.Ct. 1029]. *Cox Broadcasting* noted this concern with overdeterrence in the context of information made public through official court records, but the fear of excessive media self-suppression is applicable as well to other information released, without qualification, by the government. A contrary rule, depriving protection to those who rely on the government's implied representations of the lawfulness of dissemination, would force upon the media the onerous obligation of sifting through government press releases, reports, and pronouncements to prune out material arguably unlawful for publication.

Applied to the instant case, the *Daily Mail* principle clearly commands reversal. The first inquiry is whether the newspaper "lawfully obtain[ed] truthful information about a matter of public significance." 443 U.S., at 103 [99 S.Ct. 2667].... Appellee's argument to the contrary is based on the fact that under Florida law, police reports which reveal the identity of the victim of a sexual offense are not among the matters of "public record" which the public, by law, is entitled to inspect. But the fact that state officials are not required to disclose such reports does not make it unlawful for a newspaper to receive them when furnished by the government. Nor does the fact that the Department apparently failed to fulfill its obligation under § 794.03 not to "cause or allow to be ... published" the name of a sexual offense victim make the newspaper's ensuing. receipt of this information unlawful.

*Id.* at 533–36, 109 S.Ct. 2603 (some brackets and ellipsis points in original and some added) (footnote omitted).

■ In the instant matter, as in *Florida Star*, the release of the confidential court documents was unauthorized by the government agency involved. However, pursuant to the *Florida Star* rationale, once the information was, in fact, made available to the public, its publication could not be subject to penalty. Jenkins contends that the instant matter is distinguishable from *Florida Star* in that (1) the statement in the article at issue here was not truthful, (2) the statute that required the petition to remain confidential was not aimed solely at the news media, and (3) Liberty News had actual notice of the petition's confidential status. However, as the discussion below demonstrates, these distinctions are not sufficient to render *Florida Star* inapposite here.

### 2. Inadvertent errors in publication are not evidence of actual malice.

■ Jenkins argues that either (1) the *Florida Star* holding is not applicable to the facts of the instant matter, inasmuch as it is limited to the publication of *truthful* information that has been lawfully obtained, or (2) the use of Brian Jenkins's name, as referenced in a secondary source, *i.e.*, the letter attached to the petition, rather than the petition itself, was evidence of "reckless disregard" of the truth of the published statements so as to constitute actual malice. We disagree with both arguments.

There appears to be no dispute that Liberty News published the article without any subjective awareness of its inaccuracy. In his memorandum in opposition to Liberty News' motion for summary judgment as to his claims of actual malice (Count II) and punitive damages (Count III), Jenkins concedes that the "Defendants learned that the Article was incorrect only one day after it was published. . . ." This court noted in *Tagawa v. Maui Publishing Co., Ltd.*, 50 Haw. 648, 448 P.2d 337 (1968), that "[a]n investigatory failure alone on the part of the publisher, without a high degree of awareness of probable falsity may raise the issue of negligence but not the issue of 'actual malice.'" *Id.* at 652, 448 P.2d at 340 (citing *New York Times Co. v. Sullivan*, 376 U.S. 254, 287–88, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); *Beckley*

*Newspapers Corp. v. Hanks*, 389 U.S. 81, 83–85, 88 S.Ct. 197, 19 L.Ed.2d 248 (1967); *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 153–54, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967); *Washington Post Co. v. Keogh*, 365 F.2d 965, 966–67 n. 1 (D.C.Cir.1966)). "In other words, mere negligence is not 'actual malice.'" *Tagawa*, 50 Haw. at 653, 448 P.2d at 341.

This rule is in accord with the position taken by other jurisdictions. For example, in *Glover v. Herald Co.*, 549 S.W.2d 858 (Mo.1977), the Missouri Supreme Court reversed a trial court's judgment in favor of an alderwoman to whom statements made at a meeting of the St. Louis Board of Aldermen were incorrectly attributed. In *Glover*, the newspaper writer who composed the story at issue explained his error as follows:

I was working on a deadline, and I had a bundle of names in the story, and we talked about it, and how some of the people voted, and it was just a personal mistake on my part. I was given the correct information by [the reporter covering the meeting]. On my typewritten notes, I had Mrs. Glover's name a couple of lines above Mrs. Stewart's name, and in reading over the notes, I didn't notice Mrs. Stewart's name and saw Mrs. Glover's name, and I attributed the wrong remark to the wrong person.

*Id.* at 860. Reciting the United States Supreme Court's observation in *New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), that "erroneous statement is inevitable in free debate and . . . it must be protected if the freedoms of expression are to have the 'breathing space' that they 'need . . . to survive,'" *id.* at 861, the *Glover* court held that the fact that the copywriter had made an error in the story, even though he had the correct facts available to him, was insufficient to establish that the defendant newspaper had "'entertained serious doubts as to the truth of [the] publication,'" and, therefore, had acted with the "actual malice" necessary to sustain the judgment against it. *Id.* at 862 (quoting *St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968)). *See also Goodrick v. Gannett Co., Inc.*, 500 F.Supp.

125 (D.Del.1980) (holding that assistant public defender could not recover against newspaper that mistakenly identified his photograph as that of a county jail inmate); *Milgroom v. News Group Boston,* 412 Mass. 9, 586 N.E.2d 985 (1992) (holding that former state court judge and her lawyer husband could not recover against newspaper publisher and reporter who inaccurately reported the number of days that she was absent from her judicial duties during the two and one-half years prior to her retirement); *Richie v. Paramount Pictures Corp.,* 544 N.W.2d 21 (Minn.1996) (holding that godparents of child who had prevailed in a civil action against the child's parents could not recover for publication of a picture of them with the child that was accompanied by a misidentification of them as the parents). Accordingly, Jenkins's assertion that Liberty News mistakenly reported the information gleaned from the petition and its supporting documents is insufficient to support a finding of "actual malice."

3. *HRS § 431:15–203 establishes a procedural rule for the Insurance Commissioner and court personnel who are involved in investigations conducted by the Commissioner; it establishes no duty of confidentiality either on the part of the media or the general public.*

■ Jenkins offers *Cohen v. Cowles Media Co.,* 501 U.S. 663, 111 S.Ct. 2513, 115 L.Ed.2d 586 (1991), in support of his position that, unlike the statute that formed the alleged basis for liability in *Florida Star,* HRS § 431:15–203, *see supra* note 1, "is one of general application, [and, therefore,] the Court's holding in *Florida Star* does not apply" to the instant matter. Jenkins overstates his case.

In *Cohen,* the United States Supreme Court reversed a decision by the Minnesota Supreme Court that a newspaper informant who had been promised anonymity could not pursue a civil action against the newspaper that revealed his identity, because " 'in this case[,] enforcement of the promise of confidentiality under a promissory estoppel theory would violate defendants' First Amendment rights.' " *Id.* at 667 [111 S.Ct. 2513] (quoting *Cohen v. Cowles Media Co.,* 457

N.W.2d 199, 205 (Minn.1990)). In deciding that the first amendment did not foreclose the informant's claim for relief, the *Cohen* court reasoned:

> Respondents rely on the proposition that "if a newspaper lawfully obtains truthful information about a matter of public significance then state officials may not constitutionally punish publication of the information, absent a need to further a state interest of the highest order." *Smith v. Daily Mail Publishing Co.,* 443 U.S. 97, 103 [99 S.Ct. 2667, 61 L.Ed.2d 399] (1979). That proposition is unexceptional, and it has been applied in various cases that have found insufficient the asserted state interest in preventing publication of truthful, lawfully obtained information. See, *e.g., Florida Star v. B.J.F.,* 491 U.S. 524 [109 S.Ct. 2603, 105 L.Ed.2d 443] (1989); *Smith v. Daily Mail, supra; Landmark Communications, Inc. v. Virginia,* 435 U.S. 829 [98 S.Ct. 1535, 56 L.Ed.2d 1] (1978).
>
> This case, however, is not controlled by this line of cases but, rather, by the equally well-established line of decisions holding that generally applicable laws do not offend the First Amendment simply because their enforcement against the press has incidental effects on its ability to gather and report the news. As the cases relied on by respondents recognize, the truthful information sought to be published must be lawfully acquired. The press may not with impunity break and enter an office or dwelling to gather news. Neither does the First Amendment relieve a newspaper reporter of the obligation shared by all citizens to respond to a grand jury subpoena and answer questions relevant to a criminal investigation, even though the reporter might be required to reveal a confidential source. *Branzburg v. Hayes,* 408 U.S. 665 [92 S.Ct. 2646, 33 L.Ed.2d 626] (1972). The press, like others interested in publishing, may not publish copyrighted material without obeying the copyright laws. See *Zacchini v. Scripps–Howard Broadcasting Co.,* 433 U.S. 562, 576–79 [97 S.Ct. 2849, 53 L.Ed.2d 965] (1977). Similarly, the media must obey the National Labor

Relations Act, *Associated Press v. NLRB,* 301 U.S. 103 [57 S.Ct. 650, 81 L.Ed. 953] (1937), and the Fair Labor Standards Act, *Oklahoma Press Publishing Co. v. Walling,* 327 U.S. 186, 192–93 [66 S.Ct. 494, 90 L.Ed. 614] (1946); may not restrain trade in violation of the antitrust laws, *Associated Press v. United States,* 326 U.S. 1 [65 S.Ct. 1416, 89 L.Ed. 2013] (1945); *Citizen Publishing Co. v. United States,* 394 U.S. 131, 139 [89 S.Ct. 927, 22 L.Ed.2d 148] (1969); and must pay nondiscriminatory taxes, *Murdock v. Pennsylvania,* 319 U.S. 105, 112 [63 S.Ct. 870, 87 L.Ed. 1292] (1943); *Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue,* 460 U.S. 575, 581–83 [103 S.Ct. 1365, 75 L.Ed.2d 295] (1983). *Cf. University of Pennsylvania v. EEOC,* 493 U.S. 182, 201–02 [110 S.Ct. 577, 107 L.Ed.2d 571] (1990). It is, therefore, beyond dispute that "[t]he publisher of a newspaper has no special immunity from the application of general laws. He has no special privilege to invade the rights and liberties of others." *Associated Press v. NLRB, supra,* at 132–33 [57 S.Ct. 650]. Accordingly, enforcement of such general laws against the press is not subject to stricter scrutiny than would be applied to enforcement against other persons or organizations.

There can be little doubt that the Minnesota doctrine of promissory estoppel is a law of general applicability. It does not target or single out the press. Rather, insofar as we are advised, the doctrine is generally applicable to the daily transactions of all the citizens of Minnesota. The First Amendment does not forbid its application to the press.

[The dissent] suggests that applying Minnesota promissory estoppel doctrine in this case will "punish" respondents for publishing truthful information that was lawfully obtained.... [However, its] reliance on cases like *Florida Star v. B.J.F., supra,* and *Smith v. Daily Mail* is misplaced. In those cases, the State itself defined the content of publications that would trigger liability. Here, by contrast, Minnesota law simply requires those making promises to keep them. The parties themselves, as in this case, determined the

scope of their legal obligations, and any restrictions that may be placed on the publication of truthful information are self-imposed.

*Cohen,* 501 U.S. at 668–71, 111 S.Ct. 2513 (some citations omitted).

■ The first problem that arises in Jenkins's effort to conform the instant matter to the circumstances underlying the decision of the *Cohen* Court is that the plain language of HRS § 431:15–203, *see supra* note 1, does not suggest that *any* third party—whether a member of the general public or the news media—may be penalized for disclosure of materials deemed "confidential" pursuant to the statute. Furthermore, " '[l]aws in pari materia, or upon the same subject matter, shall be construed with reference to each other. What is clear in one statute may be called upon in aid to explain what is doubtful in another.' HRS § 1–16 (1993)." *Ho v. Leftwich,* 88 Hawai'i 251, 257, 965 P.2d 793, 796 (1998) (quoting *Korean Buddhist Dae Won Sa Temple v. Sullivan,* 87 Hawai'i 217, 229–30, 953 P.2d 1315, 1327–28 (1998)). All statutory references in the enforcement provisions of chapter 431 preceding HRS § 431:15–203 are directed at the insurance industry and the Commissioner. Nothing in the wording of HRS § 431:15–203 may be fairly construed as redirecting its applicability either to the general public or to the news media. Accordingly, it is apparent that the statute establishes a duty governing the conduct of the Commissioner and court personnel who are involved in investigations conducted by the Commissioner and cannot form a basis for the imposition of liability upon third parties who may inadvertently come into possession of material deemed "confidential" pursuant to the statute's terms.

4. *Liberty News's actual notice that the petition was confidential is irrelevant to the application of the holding of Florida Star to preclude imposition of civil liability.*

■ Next, Jenkins contends that the present case is distinguishable on its facts from *Florida Star* because Liberty News had actual notice that the petition was intended to be confidential. This argument is also un-

persuasive. While it is true that the reporter who wrote the article at issue in *Florida Star* was unaware that publication of the names of sex crime victims was unlawful, in *Landmark Communications, Inc. v. Virginia,* 435 U.S. 829, 98 S.Ct. 1535, 56 L.Ed.2d 1 (1978), one of the cases foundational to the *Florida Star* decision, the United States Supreme Court reversed a conviction entered against a Virginia newspaper that had published the name of a judge, who was the subject of a pending judicial disciplinary proceeding, in violation of a statute that prohibited such disclosure, notwithstanding that the managing editor of the newspaper acknowledged that he was aware that it was a misdemeanor for anyone involved in the proceedings to divulge the identity of judges involved. *Id.* at 832, 98 S.Ct. 1535. Hence, knowledge that lawfully obtained materials were intended to be kept confidential does not preclude the application of the holding of *Florida Star* in the instant matter.

5. *Liberty News' post-publication behavior does not constitute evidence of actual malice.*

██ Finally, Jenkins contends that Liberty News's failure to issue a retraction quickly enough to forestall republication of the story by Associated Press subscribers is evidence of actual malice. Once again, his argument fails. In *New York Times v. Sullivan,* the United States Supreme Court held that "[t]he Times' failure to retract upon respondent's demand ... is ... not adequate evidence of malice for constitutional purposes." 376 U.S. at 286, 84 S.Ct. 710. *Accord Glover,* 549 S.W.2d at 861 ("[A]ctual malice is to be measured at the time of publication[.]") (Citing *New York Times,* 376 U.S. at 286, 84 S.Ct. 710.); *Jurkowski v. Crawley,* 637 P.2d 56, 62 (Okla.1981) ("It is proof of guilty knowledge prior to publication that demonstrates that the First Amendment immunity does not apply.").

Moreover, in the instant matter, Liberty News learned of its error on Saturday. The Star Bulletin does not publish a Sunday edition. A retraction was published in the Monday edition of the newspaper. Thus, even if failure to retract were somehow "adequate evidence of malice for constitutional purposes," Liberty News's publication of a retraction in the first edition of the paper following the discovery of its error cannot be construed as a failure to retract.

Jenkins cites *Shepard v. Nabb,* 84 Md.App. 687, 581 A.2d 839 (Md.Ct.App.1990), and *Brown v. First National Bank of Mason City,* 193 N.W.2d 547 (Iowa 1972), for the proposition that the "author of defamatory statements is liable for the republication of those statements by a third person when the republication is 'the natural and probable consequence of the original act of uttering or publishing the libel or slander.'" However, both of these cases are distinguishable from the instant matter on their facts.

In *Shepard* and *Nabb,* "actual malice" was never at issue. Under circumstances such as those presented by the instant matter, liability cannot arise purely by virtue of the foreseeability of a statement's republication, inasmuch as, in the absence of actual malice, the heightened "subjective awareness" standard imposed by the first amendment renders the statement non-actionable in the first place. As the United States District Court for the Southern District of New York has aptly noted:

> The standard of liability imposed for republication also has a constitutional dimension in cases involving public issues. *New York Times v. Sullivan* and its progeny preclude states from imposing liability without fault in actions for defamation.... This principle would appear to preclude imposing liability for a republication on a party who had neither actual nor corporate responsibility for the decision to republish or its implementation if the publication is entitled to constitutional protection.

*Davis v. Costa–Gavras,* 580 F.Supp. 1082, 1097 (S.D.N.Y.1984) (citations omitted). *See also Davis v. National Broadcasting Co.,* 320 F.Supp. 1070, 1072 (E.D.La.1970) (granting motion for summary judgment in favor of defendant, who was allegedly liable for republication of statements initially made in television broadcast, in part because television network exercised no control over newspaper's decision to republish); *Mitchell v. Superior Court,* 37 Cal.3d 268, 208 Cal.Rptr.

152, 690 P.2d 625, 633 (Cal.1984) (holding that original publisher's liability for republication "would depend upon proof that they acted with actual malice in the original publication of the defamatory matter"). Accordingly, inasmuch as Jenkins has not shown that Liberty News acted with actual malice in its initial publication of the inaccurate statement about him, Liberty News bears no liability for the subsequent republication of its article, over which Jenkins does not even allege that Liberty News had control.

B. *Jenkins has made no showing of actual damages, which is a prerequisite to sustaining his claim of negligence.*

Jenkins's final point of error is that the circuit court erred in ruling that he had failed to prove the "actual damages" necessary to sustain his claim of negligence and, therefore, that the circuit court wrongly entered summary judgment in favor of Liberty News with respect to Count I of his complaint. Review of the record reveals that Jenkins's final point of error also fails.

In *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), the United States Supreme Court held that

[i]t is necessary to restrict defamation plaintiffs who do not prove knowledge of falsity or reckless disregard for the truth to compensation for actual injury. We need not define "actual injury," as trial courts have wide experience in framing appropriate jury instructions in tort actions. Suffice it to say that actual injury is not limited to out-of-pocket loss. Indeed, the more customary types of actual harm inflicted by defamatory falsehood include impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering. Of course, ... all awards must be supported by competent evidence concerning the injury, although there need be no evidence which assigns an actual dollar amount to the injury.

*Id.* at 349–50, 94 S.Ct. 2997.

In the instant matter, Jenkins contends that he sustained actual injury from the damage to his professional reputation inflicted by the erroneous allegations leveled in the Liberty News article, as well as from emotional distress. In this connection, he offers the following deposition testimony regarding the injuries he allegedly sustained as a result of the publication of the Liberty News article:

Q Now you said that you had talked about the articles with, I think you said maybe three or four people who knew you.

Can you remember the names of anyone other than somebody with J.D. Jenkins or its, or your co-counsel who actually said something to you about any of these articles?

A I believe I had a conversation with a friend of mine named Robert McDonald who asked me about it.

Q Anybody else?

A Nobody that I can recollect.

Q Let's talk about your conversation with Mr. McDonald. How do you happen to know him?

A I went to high school with him.

Q And tell me about roughly when was the conversation?

A He said that he saw an article in the newspaper and asked me about it. And that's about all I remember of that conversation.

Q Can you remember roughly when that was in relation to the publications of the articles?

A Oh, it was after the publication. I don't remember exactly when.

Q But I mean can you narrow it down at all to—

A Not with any certainty.

. . . .

Q And can you recall anything at all about how the subject of the news articles came up in that conversation?

A Yes, I think he asked me about them.

Q What did he say?

A I don't remember. Just that that topic was a topic that was discussed. I don't remember the words he said.

. . . .

Q Did he say to you that the article, that he thought the article said you had embezzled money or did he—

A I don't remember the details of the conversation.

. . . .

Q Now can you remember any other conversation that you had with anybody else about the article even if you don't remember their names?

A I remember the fact of conversations. I remember the fact that there were inquiries about the article and that I said that the allegations in the article were untrue.

Q And roughly how many conversations do you remember?

A About three or four.

Q Does that include the conversation with Mr. McDonald?

A I believe so.

. . . .

Q Can you remember if any of these three or four conversations were primarily focused on the articles or were they ... simply something which was discussed along with other subject matters? Do you remember anything like that?

A It's a long time ago. I don't remember.

. . . .

Q Were there clients that you were doing work for when you were with the Rush Moore office who also came over to your new office when you opened it?

A Well, the procedure was that when we left the firm, Mr. Sanpei who was the manager, managing partner of Rush Moore Craven, drafted a letter that went to all of the clients that Jim and I worked with and he gave them the option of staying with Rush Moore or transferring their files to the new firm and many of my clients elected to come with me. . . .

Q As far as the thought that you and Mr. Brumbaugh had given to the opening of a new office and whether it [would] be financially feasible or not, were the number of clients who went with you and Mr. Brumbaugh, did it meet you expectation, fall below your expectation, exceed your expectations or what?

A I don't think that I was surprised by the clients that came with me. I had established a personal relationship with them, sometimes over a number of years. So I was not surprised that they elected to come with me.

Q So basically as far as your thinking about the clients who you were servicing before you left Rush Moore and whether they would come over with you if you went on your own, did that actually carry through pretty much as you had expected?

A Yes, pretty much.

Q How about from Mr. Brumbaugh as far as you know?

A As far as I know, a number of his clients came with him.

Q Can you think of any—you say you weren't surprised about the client who did go with you.

Were there any surprises as far as clients who you thought would go with you and then did not?

A Not that I recollect.

. . . .

Q Now those three or four conversations took place within a relatively short time after the publications, the last one being probably sometime around the end of the summer of '95, correct?

A That sounds about right.

Q Since the end of the summer of '95, have you had any conversations with anyone in which the subject matter of the news articles was brought up or discussed other than conversations with your counsel?

A Or my clients?

Q Or your clients.

A No.

. . . .

Q In the complaint, it's alleged that the publication injured your reputation and occupation as an attorney.

Could you describe for me what evidence you have of any injury to your reputation?

A Yeah, my feeling is that I would have received more business, I would have received more new clients, that my billings would have been and the work available would have been greater if it had not been for the story.

Q Can you think of the names of any persons or companies who you feel you would have gotten business from or would have had more billings for?

. . . .

A No, I cannot. That would be speculation on my part.

. . . .

Q The complaint also asks for, indicates that it asks for damages for emotional distress.

Would you describe for me please the emotional distress that you have sustained as a result of the publication?

A Having my reputation as an honest attorney that worked very hard to get there, being slandered in the paper was extremely upsetting.

It was devastating. I've worked very hard to accomplish what I have. That's the type of emotional distress that I have suffered.

Q Have you sought any type of medical care for that?

A No.

Q Have you sought any kind of counseling?

A No.

. . . .

Q In relation to this, the problems which you feel have resulted from this publication, you haven't sought any help like that?

A No.

Q As far as any efforts to quantify any financial loss, have you made any effort to quantify that?

A Yes.

Q What have you done?

A I was comparing the amount of money that I brought in for my work as an attorney when I was with the law firm of Rush Moore Craven and compared that to the amount of money that I was bringing in as an attorney subsequent to the publication.

. . . .

Q ... I'm trying to find out the present state of your claim for damages against my client and so I want to know what your best estimate is of those damages, if you have one.

A I don't have any estimate that I would feel comfortable with that ... wouldn't be based mostly on speculation.

Q So what process do you feel it would be necessary to go through in order for you to come up with a number?

A Well, I would look at my gross income versus my net income while I was a partner at Rush Moore Craven and then I would look at my—and I would project that my gross income would remain relatively steady if decreased slightly or increased slightly while on my own and compare that with what my actual costs are.

... An then my belief is that there would be a substantial increase in my net income while on my own if it had not been for the newspaper stories.

Q Can you give me the names of anyone who you claim thinks less of you as a result of the publications?

A I can't give you any names.

Q You mentioned the three of four conversation that you had with people.

Besides that, have you received any information from anyone who reported to you anything about anyone thinking less of you?

A No.

1. *Jenkins has offered no competent evidence of damage to his business or reputation.*

While the question of what quantum of evidence of damages is necessary to sustain a defamation action against a motion for summary judgment has not previously been addressed in Hawai'i, on similar facts, the appellate courts of other jurisdictions have affirmed summary judgments based on the absence of proof of any actual harm. For example, in *Richie*, the Minnesota Supreme Court upheld a trial court's entry of summary judgment against two defamation plaintiffs, based on insufficient evidence of injury, as follows:

Neither Gerten nor Richie argue to this court that they should survive summary judgment based on presumed harm to reputation. Rather, they claim that they have

suffered demonstrable harm to their reputations. Gerten and Richie cite " several inquiries [Richie received] from family and friends regarding his involvement with the abuse and criminal trial described in Maury Povich's interview." Richie also testified that an employee at a Hardee's restaurant in Eden Prairie who was usually "pretty nice," gave him the "cold shoulder" and, approximately a year after the broadcast, the restaurant served him three cheeseburgers that were all raw. Finally, both respondents argue that they "have come to understand they will never know whether people saw the broadcast or think ill of them because of it."

The trial court, however, found that neither Gerten nor Richie suffered actual damages to his or her respective reputation. Regarding Richie, the trial court stated:

Richie has lost no income as a result of the broadcast, and he has incurred no expenses to mitigate, correct or counteract the broadcast, aside from this suit. No one has indicated to him that they think less of him because of the broadcast. No one has indicated to Richie that they thought he was one of Denise Richie's parents or was involved actively or passively in Denise Richie's abuse. There has been no change in the behavior of those he regularly encounters as a Xerox service representative.

With respect to Gerten, the court found:

In the more than one year between the broadcast and Gerten's deposition, only [two people, who knew the photos were a mistake,] contacted her about the show; no one else has contacted her or told her they watched the show.

In addition, the show had no effect on her work. She has lost no income, incurred no expense and taken no steps to mitigate, correct or counteract the broadcast, aside from this suit. No one has told Gerten they thought less of her because of the broadcast, and she can point to no specific facts demonstrating that her reputation has been affected. Finally, she has heard no rumors in her home community * * * as a result of the broadcast.

These findings were based on deposition testimony of Gerten and Richie and are not clearly erroneous. We conclude that neither Gerten nor Richie demonstrated that there is a material question of fact as to whether either of them suffered sufficient harm to their respective reputations to support a defamation claim.

544 N.W.2d at 26–27 (brackets and asterisks in original).

In *Salomone v. MacMillan Publishing Co., Inc.*, 77 A.D.2d 501, 429 N.Y.S.2d 441 (N.Y.App.Div.1980), a New York appellate court reversed a trial court's denial of a defendant's motion for summary judgment, which asserted the absence of any evidence that the plaintiff had suffered actual damage, reasoning as follows:

Plaintiff pleads no special damage. He concedes that he has sustained no financial loss or physical damage attributable to appellants' publication. He claims damages for loss of reputation and for mental anguish. He has been unable to come forth with any proof of loss of reputation because he knows of no one who believes he was a child molester or thinks less of him due to the publication. The law restricts compensation to "actual injury" and does not permit a presumption of damaged reputation.... Plaintiff has provided no such evidence and appellants' evidence is to the contrary.

*Id.* at 442–43.

In the matter before us, Jenkins, like the plaintiffs in *Richie* and *Salomone*, reports only "three or four" inquiries from acquaintances regarding the newspaper article; he cannot name anyone whom he believes thinks less of him because of the erroneous publication. His deposition testimony is simply too vague to support a finding that he has suffered any actual damage to his reputation. His claim of injury to his business is equally speculative. Shortly after the story was published, Jenkins, of his own volition, left the Maui branch of a Honolulu law firm to form his own firm with another partner from his former firm. He testified that he was able to take with him all of the clients

whom he expected to follow him to his new firm. He admitted during discovery that he could not think of a single client or matter that he had lost as the result of the alleged defamation. He offers only his "feeling" that he would have derived greater net earned income had the story not appeared.

 Such "evidence" of business losses is not competent under general libel law. A libel plaintiff claiming loss of earnings must adduce admissible evidence that the defamation was a "material element or substantial cause" of actual economic damage. *See, e.g., Tosti v. Ayik,* 394 Mass. 482, 476 N.E.2d 928, 939 (Mass.1985) (*citing* cases). Jenkins, however, adduced no competent evidence that his small fledgling law firm would have generated the same or similar net income as he had enjoyed at the Rush Moore law firm if the alleged defamation had not occurred. Accordingly, there being no factual basis, other than speculation, upon which a jury could have found that the alleged defamation was the legal cause of any claimed loss, we hold that the circuit court properly granted Liberty News's motion for summary judgment as to the negligence count of Jenkins's complaint. *See Benham v. World Airways, Inc.,* 432 F.2d 359, 360–61 (9th Cir.1970) ("Although Hawaii recognizes that loss of future profits is an appropriate element of damages . . ., it also requires that[,] to sustain a claim for such profits, 'facts must exist and be shown by the evidence which afford a basis for measuring the plaintiff's loss with reasonable certainty. The damages must be susceptible of ascertainment in some manner other than by mere speculation, conjecture, or surmise.' . . . The proof of future profits in this case never rose above the level of hope and conjecture[, because] . . ., [i]n part, the assumptions rested on expectations about the conduct of third persons . . . . The essential determination that the new firm could successfully divert the custom of its competitors is . . . unsupported in the record. [The plaintiff's] cheerful prognostications are no more than the factual data upon which they were based. The factual foundation was absent, and the opinions accordingly collapse." (Quoting *Ferreira v. Honolulu Star–Bulletin Ltd.,* 44 Haw. 567, 356 P.2d 651 (1960).)).

2. *Jenkins may not recover for emotional distress in the absence of some physical injury to property or person.*

 "[R]ecovery for negligent infliction of emotional distress by one not physically injured is generally permitted only when there is some physical injury to property or a person resulting from the defendant's conduct." *Tseu v. Jeyte,* 88 Hawai'i 85, 92, 962 P.2d 344, 351 (1998) (quoting *Ross v. Stouffer Hotel Co.,* 76 Hawai'i 454, 465–66, 879 P.2d 1037, 1048–49 (1994)) (internal quotation marks omitted); *see also Tabieros v. Clark Equip. Co.,* 85 Hawai'i 336, 371, 944 P.2d 1279, 1304 (1997) (quoting *Ross* ). Inasmuch as Jenkins has failed to show any damage to a person or property, *see supra* section III.B.1, he is precluded from recovery based solely on his claim of emotional distress.

### IV. CONCLUSION

For the reasons discussed above, the judgment and orders appealed from are affirmed.